**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 25, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DISH NETWORK CORPORATION;
DISH NETWORK, LLC.,

     Plaintiffs - Appellants,

v.

ARROWOOD INDEMNITY
COMPANY; TRAVELERS
INDEMNITY COMPANY OF
ILLINOIS; XL INSURANCE
AMERICA, INC.; NATIONAL
UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.,

     Defendants - Appellees,

and

ARCH SPECIALTY INSURANCE
COMPANY,

     Defendant.

No. 13-1457

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:09-CV-00447-JLK-MEH)**

---

Lee M. Epstein of Flaster Greenberg, P.C., Philadelphia, Pennsylvania, for
Plaintiffs-Appellants.

Daniel I. Graham of Nicolaides Fink Thorpe Michaelides Sullivan LLP, Chicago,
Illinois, and Kevin F. Amatuzio of Montgomery, Kolodny, Amatuzio &

Dusbabek, LLP, of Denver Colorado, (George S. McCall and S. Vance Wittie of Sedgwick, LLC, Dallas Texas; Roger K. Heidenreich and Deborah C. Druley of Dentons US LLP, St. Louis, Missouri; Anders C. Wick of Dentons US LLP, Chicago, Illinois; Barbara I. Michaelides, Agelo L. Reppas, and Bridget M. Curry of Nicolaides Fink Thorpe Michaelides Sullivan LLP, Chicago, Illinois, with them on the brief), for Defendants-Appellees.

---

Before **BRISCOE,** Chief Judge, **HARTZ** and **HOLMES**, Circuit Judges.

---

**BRISCOE**, Chief Judge.

Plaintiffs DISH Network Corporation and DISH Network LLC filed this action seeking a declaratory judgment that their commercial general liability and excess liability insurers (collectively the Insurers), Arch Specialty Insurance Company (Arch), Arrowood Indemnity Company (Arrowood), Travelers Indemnity Company of Illinois (Travelers), XL Insurance America, Inc. (XL), and National Union Fire Insurance Company of Pittsburgh, Pa. (National Union), had a duty to defend and indemnify plaintiffs in an underlying patent infringement action. The district court granted summary judgment in favor of the Insurers, plaintiffs appealed, and this court reversed and remanded for further proceedings. DISH Network Corp. v. Arch Spec. Ins. Co., 659 F.3d 1010 (10th Cir. 2011) (DISH I). On remand, the Insurers moved again for summary judgment, but on different grounds than before. The district court granted the Insurers' motions, and plaintiffs appealed. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

2

# I

DISH Network Corporation is a Nevada corporation with its principal place of business in Englewood, Colorado. DISH Network LLC is a Colorado limited liability company with its principal place of business in Englewood, Colorado. DISH Network LLC is an indirectly, wholly-owned subsidiary of DISH Network Corporation. These two entities, which will be referred to collectively as Dish,[1] provide direct-to-the-home satellite television products and services, including video and audio programming, to more than 14 million paying subscribers.

*Dish's insurance policies*

"Between 2001 and 2004, Dish purchased . . . primary and excess commercial general liability policies . . . from the five defendant Insurers." DISH I, 659 F.3d at 1013. "Primary insurance is provided by Arrowood and Travelers, while XL, Arch, and National Union are responsible for excess coverage if the primary policies are exhausted." Id.

"All of the policies promise to defend and indemnify Dish against claims alleging 'advertising injury,' among other things." Id. "Most of the policies define 'advertising injury'" in the following manner:

"Advertising Injury" means injury arising out of one or more of the
following offenses:
     1. Oral or written publication of material that slanders or libels
     a person or organization or disparages a person's or

---

[1] Dish was formerly known as EchoStar Communications Corporation and EchoStar Satellite LLC (collectively EchoStar). DISH I, 659 F.3d at 1012.

organization's goods, products or services;
2. Oral or written publication of material that violates a person's right to privacy;
3. Misappropriation of advertising ideas or style of doing business; or
4. Infringement of copyright, title or slogan.

Id. The National Union policy differs slightly, "limit[ing] coverage to 'injury arising *solely* out of your advertising activities as a result of' one or more of the four types of offenses." Id. (emphasis added in DISH I). Likewise, the Arch policy defines the phrase "advertising injury" differently, referring to it, in pertinent part, as "[t]he use of another's advertising idea in your 'advertisement.'" Id. In addition, the Arch policy "contains a clause excluding from coverage 'any claim . . . [a]rising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.'" Id. This exclusion "does not apply to infringement, in [the insured's] 'advertisement,' of copyright, trade dress or slogan." Id. (internal quotation marks omitted).

*The underlying patent infringement suit*

In approximately 2007, Dish became the defendant in a patent infringement suit brought in the Northern District of California by Ronald A. Katz Technology Licensing, L.P. (RAKTL). According to RAKTL's complaint, RAKTL's patents related to "the field of interactive call processing" and "the integration of telephonic systems with computer databases and live operator call centers to provide interactive call processing services." Id. at 1013. RAKTL's complaint

4

further alleged that Dish

> had infringed one or more claims in each of twenty-three patents . . .
> by "making, using, offering to sell, and/or selling . . . automated
> telephone systems, including without limitation the DISH Network
> customer service telephone system, that allow [Dish's] customers to
> perform pay-per-view ordering and customer service functions over
> the telephone."

Id. at 1012-13.

*The initiation and initial resolution of this action*

"On receiving RAKTL's complaint, Dish requested a defense from Insurers, who denied coverage." Id. at 1014. "Dish then brought this suit, seeking a judgment declaring that Insurers had a duty to defend and indemnify it in the underlying action." Id. "Dish also sued for damages for breach of contract and Insurers' duty of good faith and fair dealing." Id.

The district court, in response to the Insurers' motions, granted summary judgment in their favor. "Applying Colorado law, the district court concluded that a claim for patent infringement, such as the one [asserted by RAKTL against Dish], could properly give rise to coverage, or even the specter of coverage, such that an insurer will have a duty to defend." Id. (internal quotation marks omitted). "The duty would arise, the court stated, where the insured established three elements: first, that it was engaged in 'advertising' during the relevant period; second, that the underlying complaint alleged a predicate offense under the policy language; and third, that a causal connection existed between the

5

advertising and the alleged injury suffered by the patent holder." Id.

The district court concluded, for purposes of the Insurers' summary judgment motion, "that RAKTL's reference to 'customer service functions' in its complaint was sufficient to allege that Dish engaged in 'advertising.'" Id. "The [district] court rejected, however, Dish's argument that its use of a patented interactive telephone system to advertise could constitute 'misappropriation of advertising ideas or style of doing business,' the sole predicate offense on which Dish relied." Id. The court explained that "[t]he [RAKTL] complaint focuses on [Dish]'s use of these patented technologies as a means of conveying content to and tailoring its interactions with its customers." Id. (internal quotation marks omitted).

Consequently, the district court did not "address[] the third element of its test—causation—or the additional arguments certain insurers had raised under their individual policies." Id. "The [district] court also did not reach the duty to indemnify or Dish's other claims." Id.

Dish appealed from the district court's grant of summary judgment in favor of the Insurers.

*The first appeal - DISH I*

In DISH I, we reversed the district court's grant of summary judgment and remanded for further proceedings. In doing so, we concluded that "a claim for patent infringement c[ould] . . . constitute 'advertising injury' within the relevant

6

policy language." Id. at 1014. We in turn concluded that RAKTL's underlying complaint could "be read to allege 'misappropriation of advertising ideas,'" as well as a causal connection between the misappropriation of advertising ideas and RAKTL's purported injury. Id. at 1015. Consequently, "[a]s regards the duty to defend, we h[e]ld that the RAKTL complaint may arguably fall within the polic[ies] at issue because it potentially alleged advertising injury arising from Dish's misappropriation of its advertising ideas, which Dish committed in the course of advertising its goods, products, or services." Id. at 1028 (internal quotation marks and citation omitted).

We noted that "[s]everal issues . . . remain[ed] to be resolved," id., by the district court:

> In their response brief, Insurers raise arguments regarding unique language in the policies issued by Arch and National Union; specifically, they argue that Arch's intellectual property exclusion and National Union's sole causation requirement bar coverage. The excess insurers, Arch, National Union, and XL, also contend that they have no duty to defend in the absence of a showing that Dish's primary policy coverage has been exhausted. The district court did not reach these arguments, as it decided the case in favor of Insurers on other grounds. We express no view as to the merits of those arguments, but instead REMAND for the district court to address them in the first instance.

Id. at 1028-29 (internal citations omitted).

The Insurers filed a petition for rehearing en banc, which we denied.

*The district court's determination of the scope of proceedings on remand*

The district court's first step on remand was to order the parties to file a

7

joint status report. The joint status report submitted by the parties noted that they "disagree[d] as to . . . the claims remaining to be adjudicated [and] . . . whether th[e] case [wa]s ready to proceed beyond the duty to defend." App. at 288. Dish argued "that by virtue of the Tenth Circuit's ruling, judgment [could] . . . be entered in favor of [Dish] on Counts One and Three of its complaint with regard to the duty of its primary insurers, Arrowood Indemnity Company and Travelers Indemnity Company of Illinois, to defend." Id. In other words, Dish asserted, "[t]he duty to defend issue was conclusively decided by the Tenth Circuit" in DISH I. Id. at 288-89. The Insurers disagreed, arguing that Dish "did not file a motion for summary judgment with respect to the duty to defend," and "the Tenth Circuit did not find a duty to defend or direct the Trial Court to so find." Id. at 292.

The district court issued a minute order setting a scheduling conference. The minute order also stated as follows:

> This case is not yet ripe for summary disposition. Although the law of the case doctrine bars Defendants from re-litigating whether the claims of patent infringement at issue in this case can constitute advertising injury, it does not preclude the assertion of other defenses. See, e.g., Dobbs v. Anthem Blue Cross & Blue Shield, 600 F.3d 1275, 1279 (10th Cir. 2010). Defendants are entitled to raise additional defenses and request leave to file successive motions for summary judgment. See Hoffman v. Tonnemacher, 593 F.3d 908, 911 (9th Cir. 2010).

Id. at 297.

The district court subsequently conducted the scheduling conference. At

8

the outset of the conference, the district court orally affirmed the ruling contained

in its prior minute order:

> The Tenth Circuit's opinion [in DISH I] contains specific instructions on remand. It ordered me to consider two arguments raised by insurers, but not addressed in the original summary-judgment opinion; one, that Arch's intellectual-property exclusion and National Union's sole-causation requirement barred coverage; and two, that the excess insures [sic], Arch National Union and XL Insurance America, Inc., have no duty to defend in the absence of the showing that Dish's primary policy coverage has been exhausted. Significantly, the opinion contains no other limiting language or additional instructions on remand; that is, to enter judgment in favor of Dish Network.

> Nevertheless, [Dish] argue[s] the scope of remand should be limited to resolving the issues specifically mentioned by the Tenth Circuit. Accordingly, [Dish] argue[s] that summary judgment may be entered against the primary insurers, Arrowood and Travels [sic]. In the absence of additional limitations, I am entitled to exercise discretion in determining the appropriate scope of a remand, and for that I cite to United States vs. West[, 646 F.3d 745 (10th Cir. 2011)]. The exercise of that discretion is, however, limited by the law of the case. Although the Tenth Circuit has addressed the applicability of the advertising injury exclusion to the underlying Complaint, it did not address any additional exclusions contained in the relevant CGL Policies.

> Furthermore, [Dish's arguments] to the contrary not withstanding [sic], defendant's [sic] did not conclusively concede that EchoStar Satellite, LLC is covered under the policies at issue. Their concession of that argument, per its explicit terms, was, and I quote, for the purposes of summary judgment and this appeal only, closed quote. Although clumsily worded, it is apparent that defendants did not intend to waive this argument for any future proceedings.

> Having reviewed the Tenth Circuit opinion, the parties' joint-status report, my earlier minute order, and the parties proposed scheduling order, I conclude that the defendants are permitted to file renewed motions for summary judgment that address issues not

9

previously raised in their initial motions for summary judgment. The parties shall have up to and including May 9 to submit a proposed scheduling order reflecting that ruling.

Id. at 368-70.

*The district court's grant of summary judgment in favor of Insurers*

The Insurers each filed motions for summary judgment arguing that they were not obligated to defend Dish in the RAKTL patent infringement action. Dish filed a cross-motion for summary judgment on that same issue with respect to its two primary insurers, Arrowood and Travelers.[2]

The district court issued a memorandum order and opinion granting summary judgment in favor of the Insurers regarding their duty to defend Dish in the underlying RAKTL action. In doing so, the district court began by briefly revisiting the scope of the proceedings on remand:

> Relying on the Court of Appeals' phrase beginning: "As regards the duty to defend, we hold that the RAKTL complaint 'may arguably fall within the polic[ies]' at issue. . .," DISH [I], 659 F.3d at 1028 (quotation omitted), DISH posits that the Tenth Circuit has "already decided" that the claims asserted against DISH Network in the underlying Katz Action fall potentially within the coverage of the primary insurers commercial general liability ("CGL") policies. Doc. 169 at p.7.

> From the fact that I let Insurers raise new defenses, however, it is clear the duty to defend issue was not definitively closed forever and always by the Tenth Circuit opinion. The first incarnation of this

---

[2] Dish "concede[d] that Arch's intellectual property exclusion bar[red] any duty to defend Arch might have regarding the [RAKTL] Action." App. at 2486. The district court subsequently granted summary judgment in favor of Arch based upon Dish's concession. Id.

10

case involved determining whether the complained of action in the underlying litigation, specifically patent infringement of telephone technology, constituted "advertising injury" such that Defendants' various "advertising injury" exclusions would apply and preclude Defendants having a duty to defend. Although the Tenth Circuit did indeed settle that patent infringement for technologies capable of serving as conduits for advertising could constitute "advertising injury," the case as presently postured does not seek to parse what is or is not an "advertising injury."

Rather, the instant summary judgment motions foremost query what import to assign the term "broadcast" in an insurance policy, Defendants each now invoking various Business Exclusions to negate coverage for all advertising injuries suffered by insureds involved in the business of broadcasting. "Although a district court is bound to follow the mandate, and the mandate controls all matters within its scope,…a district court on remand is free to pass upon any issue which was not expressly or impliedly disposed of on appeal." Procter & Gamble Co. v. Haugen, 317 F.3d 1121, 1126 (10th Cir. 2003); Aguinaga v. United Food & Commercial Workers Int'l Union, 854 F.Supp.757, 773 (D. Kan. 1994)("The issue presented by the Union was not resolved by the Tenth Circuit in the prior appeal, and the court does no violence to the mandate rule by considering the issue herein.") Accordingly, because the Business Exclusion argument was never before the Tenth Circuit, it is appropriate for consideration on remand.

Id. at 2486-87.

The district court then turned to the coverage issue and "f[ou]nd the business in which D[ish] [wa]s engaged to fall squarely within the meaning of 'broadcasting,' such that coverage for defending the [RAKTL] Action [wa]s unavailable under the policies issued to it by Defendant Insurers." Id. at 2488. The district court further concluded that "National Union's policy contain[ed] a 'sole' causation requirement . . . that negate[d] coverage." Id. at 2508. Lastly,

11

the district court concluded that "National Union's Satellite Exclusion and XL's 'as warranted' provision also fail[ed] to provide coverage." Id.

The district court entered final judgment in favor of Insurers and Dish filed a timely notice of appeal.

## II

Dish raises four issues on appeal. The first issue concerns whether the district court violated the law of the case or deviated from our mandate in DISH I and thereby improperly expanded the scope of the proceedings on remand. The remaining three issues raised by Dish challenge various aspects of the district court's grant of summary judgment in favor of the Insurers.

## A

In its first issue on appeal, Dish argues that the district court violated the law of the case and deviated from our mandate in DISH I when it permitted the Insurers to present new arguments regarding why they were not obligated to defend Dish in the RAKTL suit. We review de novo the district court's compliance with the mandate in DISH I. See Padilla-Caldera v. Holder, 637 F.3d 1140, 1145 (10th Cir. 2011). In doing so, we examine whether the law of the case doctrine or the mandate rule "foreclose[d] any of the [district court's] actions on remand." Id. (internal quotation marks omitted).

"Under the law of the case doctrine, when a court decides an issue of law, that decision should govern all subsequent stages of the litigation." Id. In other

12

words, "if the first appeal decided the issue then the district court was bound by its determination under the law of the case doctrine, and under the general rule that a district court is bound by decisions made by its circuit court." Dobbs v. Anthem Blue Cross and Blue Shield, 600 F.3d 1275, 1279 (10th Cir. 2010) (internal citation omitted).

"The mandate rule is a corollary to the law of the case [doctrine] requiring trial court conformity with the appellate court's terms of remand." United States v. West, 646 F.3d 745, 748 (10th Cir. 2011); Zinna v. Congrove, 755 F.3d 1177, 1182 (10th Cir. 2014) (holding that the mandate rule "provides that a district court must comply strictly with the mandate rendered by the reviewing court"). "[T]he scope of the mandate on remand in the Tenth Circuit is carved out by exclusion: unless the district court's discretion is specifically cabined, it may exercise discretion on what may be heard." West, 646 F.3d at 749 (discussing proper scope of resentencing proceedings following remand). "Therefore we do not make inquiry into whether the issue presented is antecedent to or arises out of the correction on appeal." Id. "Instead the district court is to look to the mandate for any limitations on the scope of the remand and, in the absence of such limitations, exercise discretion in determining the appropriate scope." Id. "This approach has been characterized . . . as a presumption in favor of a general remand." Id. Notably, "[t]he mandate rule is a rule of policy and practice, not a jurisdictional limitation, which thus allows some flexibility in exceptional

13

circumstances." Id. (internal quotation marks omitted).

### 1. Did DISH I decide the duty-to-defend issue?

We turn first to the question of whether the district court violated the law-of-the-case doctrine by allowing the Insurers to present additional arguments regarding why they were not obligated to defend Dish in the underlying RAKTL action. According to Dish, "this Court decided the duty to defend issue" in DISH I. Aplt. Br. at 14. Indeed, Dish asserts, "[i]n seeking rehearing en banc, the Insurers argued that this Court's decision [in DISH I] required them to defend D[ish]." Id. at 8-9.

We reject Dish's assertion that DISH I resolved the duty-to-defend issue. The concluding section of DISH I stated, in pertinent part: "As regards the duty to defend, we hold that the RAKTL complaint may arguably fall within the polic[ies] at issue because it potentially alleged advertising injury arising from Dish's misappropriation of its advertising ideas, which Dish committed in the course of advertising its goods, products, or services." Id. at 1028 (emphasis added) (internal quotation marks and citation omitted). We further noted that "[s]everal issues the district court did not address [in its summary judgment order] remain[ed] to be resolved" regarding the Insurers' duty to defend. Id. Thus, in sum, DISH I did not resolve the duty-to-defend issue. Consequently, the law-of-the-case doctrine did not prohibit the district court from resolving the duty-to-defend issue on other grounds.

14

To the extent it is relevant, we also reject Dish's assertion that the Insurers conceded in their petition for rehearing en banc that they were obligated to defend Dish in the RAKTL action. In their petition for rehearing en banc, the Insurers argued, in part, that DISH I's "analysis led [this court] to mistakenly equate the use of a patented product *capable* of being used to advertise with 'misappropriation of an advertising *idea*' so as to bring the former within the 'advertising injury' coverage afforded by CGL policies, even though 'patent infringement' is not a listed offense to which coverage extends." App. at 1900 (emphasis in original). The Insurers in turn argued that "[t]he existence of 'advertising injury' coverage for patent infringement under commercial general liability ('CGL') insurance is a question of exceptional importance." Id. And, they argued, "[t]his decision requires Insurers, and will require other insurers in the future, to defend and potentially to indemnify insureds for 'patent infringement' claims that are not covered by CGL insurance." Id. Although Dish now argues that this last sentence was a concession by the Insurers that they were obligated to defend Dish in the RAKTL action, we conclude that is an overly broad reading of the sentence. Quite clearly, the Insurers were taking issue with the general notion that "advertising injury" coverage under CGL policies could conceivably provide coverage for patent infringement. But, as we see it, the Insurers were not conclusively conceding that they were obligated to defend Dish in the RAKTL action.

15

*2. Did the mandate rule effectively prohibit the district court's actions?*

We next turn to the question of whether the district court violated the mandate rule by allowing the Insurers to file new motions for summary judgment raising additional policy-based challenges to Dish's claim that the Insurers were obligated to defend Dish in the RAKTL action. To decide that question, we "must look to the mandate in [DISH I] to determine whether it specifically limit[ed] the scope of remand so as to prevent the district court from considering" the Insurer's additional arguments regarding the duty to defend. West, 646 F.3d at 749 (internal quotation marks omitted).

The remand language in DISH I stated as follows:

> We REVERSE the district court's grant of summary judgment to the Insurers and REMAND for further proceedings. While we agree with the district court's conclusion that patent infringement may, under certain circumstances, constitute "misappropriation of advertising ideas," we disagree with its ruling that the patented means of conveying advertising content at issue here could not be "advertising ideas" within the meaning of Dish's commercial general liability policies. As regards the duty to defend, we hold that the RAKTL complaint "may arguably fall within the polic[ies]" at issue, Cyprus [Amax Minerals Co. v. Lexington Ins. Co.], 74 P.3d [294,] 299 [(Colo. 2003)], because it potentially alleged advertising injury arising from Dish's misappropriation of its advertising ideas, which Dish committed in the course of advertising its goods, products, or services, Novell[, Inc. v. Federal Ins. Co.], 141 F.3d [983,] 986 [(10th Cir. 1998)].
>
> Several issues the district court did not address remain to be resolved. In their response brief, Insurers raise arguments regarding unique language in the policies issued by Arch and National Union; specifically, they argue that Arch's intellectual property exclusion and National Union's sole causation requirement bar coverage. Ins.

16

Resp. Br. at 66–70. The excess insurers, Arch, National Union, and XL, also contend that they have no duty to defend in the absence of a showing that Dish's primary policy coverage has been exhausted. Id. at 70. The district court did not reach these arguments, as it decided the case in favor of Insurers on other grounds. Dish, 734 F.Supp.2d at 1185 n. 20. We express no view as to the merits of those arguments, but instead REMAND for the district court to address them in the first instance. Accordingly, we also DENY as moot Arch and National Union's motion to strike portions of Dish's reply brief or for leave to file a surreply regarding these issues.

DISH I, 659 F.3d at 1028-29.

To be sure, this remand language acknowledged the possibility that the RAKTL complaint might fall within the policies at issue, and unequivocally directed the district court "to address . . . in the first instance" the additional arguments that were asserted by the Insurers in their original summary judgment motions but not resolved by the district court in granting those motions. But Dish misreads this language as limiting the district court from considering other arguments the Insurers might have regarding the duty to defend. Although the Insurers, in their respective answers to Dish's complaint, asserted a host of defenses to the purported duty to defend, they argued only a few of them in their initial motions for summary judgment (presumably believing that the "advertising injury" argument in particular would prevail). And, because the appeal in DISH I concerned the district court's decision to grant the Insurers' motions for summary judgment, our decision in DISH I understandably addressed the specific arguments contained in those motions and did not cast about the district court

17

record for other potential defenses. The important point is that nothing in the remand language in DISH I specifically limited or prevented the district court from allowing the Insurers to dispute the purported duty to defend on grounds other than those that were asserted in the Insurers' original motions for summary judgment. As a result, the district court did not violate the mandate rule by allowing the Insurers to file new motions for summary judgment raising additional defenses to the purported duty to defend.

B

In its second, third, and fourth issues on appeal, Dish challenges the district court's grant of summary judgment in favor of Insurers on the duty-to-defend issue. We review the district court's summary judgment ruling de novo, applying the same legal standards as the district court. Doe v. City of Albuquerque, 667 F.3d 1111, 1123 (10th Cir. 2012). "Summary judgment should be granted if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Id.

In a diversity case such as this, "the substantive law of the forum state governs the analysis of the underlying claims." Haberman v. Hartford Ins. Grp., 443 F.3d 1257, 1264 (10th Cir. 2006). We therefore apply Colorado law as we review the issues raised on appeal by Dish. Under Colorado law, we "review insurance contract interpretation questions de novo." Mountain States Mut. Cas. Co. v. Roinestad, 296 P.3d 1020, 1023 (Colo. 2013).

18

## 1. The insured's business exclusion

The district court, in granting summary judgment in favor of the Insurers, concluded that the policies' business exclusions for "broadcasting" and "telecasting" precluded coverage. On appeal, Dish challenges these related conclusions on a number of grounds.

### a) The relevant policy language

All of the policies at issue provide coverage for "advertising injury." At the same time, each of the policies contain or effectively incorporate exclusions to such coverage that hinge on the nature of the insured's business.

The Travelers and Arrowood CGL policies expressly apply to "'Advertising injury' caused by an offense committed in the course of advertising your goods, products or services," and provide that Travelers "will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'advertising injury.'" App. at 904, 1319. The "Advertising Injury Liability" sections of the two policies also include, however, several express exclusions. In particular, both policies state that "[t]his insurance does not apply to . . . 'Advertising injury' arising out of . . . [a]n offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting." Id. at 904, 1319-20. Neither policy expressly defines the terms "broadcasting" or "telecasting."

The Arch commercial umbrella policy states, in pertinent part, that "this insurance applies to 'personal and advertising injury' caused by an offense arising

19

out of your business." Id. at 1965. The "Exclusions" section of the policy, in turn, states that "[t]his insurance does not apply to, and we have no obligation to investigate, settle or defend, or pay the costs of defending, any claim or 'suit' for . . . 'Personal and advertising injury' . . . [c]ommitted by an insured whose business is . . . [a]dvertising, broadcasting, publishing or telecasting." Id. at 1965-66.

The National Union commercial umbrella policy provides that National Union "will pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay by law or assumed by the Insured under an Insured Contract because of . . . Advertising Injury that takes place during the Policy Period and is caused by an Occurrence happening anywhere in the world." Id. at 1167. The Exclusions section of the policy, however, states that "[t]his insurance does not apply to . . . Advertising Injury arising out of . . . [a]n offense committed by an Insured whose business is advertising, broadcasting, publishing or telecasting." Id. at 1173-74. The National Union policy also includes an endorsement entitled "BROADCASTING, TELECASTING, ADVERTISING AND PUBLISHING EXCLUSION." Id. at 1159. This endorsement states, in pertinent part: "This insurance does not apply to . . . Advertising Injury committed or alleged to have been committed in any advertising, advertisement, . . . broadcast, . . . or telecast in the conduct of the Insured's advertising, broadcasting, re-broadcasting, televising, [or] re-televising

20

. . . activities." Id.

Finally, the XL commercial umbrella policy provides two types of coverage: excess coverage that expressly incorporates most of "[t]he coverage provisions of the scheduled underlying policies," including those policies' business exclusions, and so-called "drop down" coverage that applies in the event that a loss is covered by the terms of the underlying policies, but the underlying insurers fail to provide such coverage. Id. at 2048.

*b) The terms "broadcasting" and "telecasting"*

None of the policies at issue expressly define the terms "broadcasting" or "telecasting," nor do they otherwise indicate that these terms were "intended to have some special meaning peculiar to the insurance industry." Mid-Century Ins. Co. v. Robles, 271 P.3d 592, 596 (Colo. App. 2011). As a result, we, like the district court, are left with the task of "constru[ing] [these terms] in [their] commonly used sense." Id.; see also Mountain States Mut. Cas. Co. v. Roinestad, 296 P.3d 1020, 1024 (Colo. 2013). As we discuss below, Dish raises several challenges to the district court's construction of those terms.

*c) The district court's construction of the terms*

The district court concluded that the term "broadcasting," as used in the policies at issue, was "synonymous with 'transmission,'" App. at 2497 (quoting Nat'l Ass'n for Better Broad. v. FCC, 849 F.2d 665, 669 (D.C. Cir. 1988)), and it in turn concluded that "[t]here [wa]s no question that D[ish] transmits, via

21

broadcast satellites, television programming to its subscribers," id. The district court rejected Dish's argument "that the satellite television programming it provides should not be considered 'broadcasting' because it is a subscription service not available to the 'indiscriminate public' or the 'public generally.'" Id. In the district court's view, "[n]othing in the case law or the common usage of the term 'broadcasting' requires that every member of the public actually see what is broadcast or have access to the broadcast for free before the broadcast will be considered directed to the 'public at large.'" Id. at 2498. "It is enough," the district court concluded, "for the broadcast or telecast to be readily available to the public at large, and certainly D[ish] strives for universal access." Id.

Although Dish argued that subscription television was classified as a non-broadcast service for purposes of the Federal Communications Act, the district court concluded that this "fact . . . says nothing about the plain, ordinary meaning of the term 'broadcasting' in general." Id. at 2499. More specifically, the district court concluded that "it is irrelevant that 'broadcasting' has a statutory definition in a regulatory scheme that excludes satellite television providers" because "the average purchaser of insurance would consider D[ish] engaged primarily in the business of broadcasting." Id.

Further, the district court concluded that Dish's "attempt to draw a distinction between subscription and non-subscription television fails because it makes no sense in the context of the Business Exclusion" contained in the

22

policies at issue.  Id. at 2500.  In support, the district court offered the following explanation:

> The reason for an insurance policy to include an exclusion for insureds in the businesses of "advertising, broadcasting, publishing or telecasting" is to limit the insurer's exposure to mass media-type injuries.  The extent of that risk is a function of how many people have access to the media, not whether they pay for it.  Both PBS and D[ish] are mass media businesses, and whether it is PBS broadcasting a slanderous statement or D[ish] broadcasting a slanderous statement, each entity presents a risky enterprise for purposes of advertising coverage.

Id. (internal footnotes omitted).  Moreover, "[t]o the extent that D[ish] maintain[ed] that the word 'broadcasting' is susceptible to an interpretation that would distinguish traditional television transmission from subscription- or satellite-based television transmission," the district court "reject[ed] that interpretation because the distinction is not supported by the underlying risk."  Id. at 2503.

The district court construed the term "telecasting" in similar fashion, effectively concluding that it "involv[ed] the transmission of television programming (as opposed to only radio broadcasting, for example) to viewers."  Id. at 2506.

*d) Dish's proposed definition of the terms*

Dish argues that the district court erred in granting summary judgment in favor of the Insurers because the terms "broadcasting" and "telecasting" must be "defined reasonably with a public distribution requirement," and "D[ish] does not

23

distribute its products and services to the public and, therefore, is not engaged in" broadcasting or telecasting. Aplt. Br. at 21. In support, Dish asserts that it "is a subscription service provider in the business of providing video and audio programming only to its paying subscribers." Id. Dish notes that "[a]ll of [its] Annual Reports contain a . . . disclosure" stating Dish's belief that, as a provider of subscription programming, it is "not subject to many of the regulatory obligations imposed upon broadcast licensees." Id. at 22. "In addition," Dish argues, "[t]he Communications Act of 1934 defines 'broadcasting' as the 'dissemination of radio communications intended to be received by the <u>public</u>, directly or by the intermediary of relation stations.'" Id. at 22-23 (emphasis added in Dish's brief) (quoting 47 U.S.C. § 153(7)). Dish in turn argues that, "[s]tarting with that definition, the FCC undertook in the mid-1980s to distinguish 'broadcasting' services from 'non-broadcasting' services" by stating that "'a necessary condition for the classification of a service as <u>broadcasting</u> is that the licensee's programming is available to all members of the public, without any special arrangements or equipment,'" and that, in contrast, "'<u>where a licensee</u> <u>embarks on a communications service in a manner which permits receipt of that</u> <u>service only by certain members of the public, that licensee **is not**</u> <u>**broadcasting**</u>.'" Id. at 23 (emphasis added in Dish's brief) (quoting Subscription Video Report and Order, 2 FCC Rcd. 1001, ¶ 27 (1987)). In light of these distinctions drawn by the FCC, Dish argues, "subscription service providers, such

24

as Direct Broadcast Satellite providers, [that] provide their services via a private contractual relationship with the subscribing audience and an encrypted signal to prevent unauthorized viewing . . . are classified as non-broadcast services." Id. And, Dish asserts, in Nat'l Ass'n For Better Broad., the D.C. Circuit "affirmed the FCC's determination that subscription video service providers, such as D[ish], are not in the business of 'broadcasting.'" Aplt. Br. at 23-24 (citing 849 F.2d at 669).

Dish also asserts that "[t]he distinction between a subscription service provider . . . and those involved in 'broadcasting' . . . is well known through government and industry." Id. at 24. "For example," Dish asserts, "the Standard Industrial Classification (SIC) System acknowledges the difference between D[ish]'s subscription services business and the businesses of 'broadcasting.'" Id. (internal footnote omitted). As a result, Dish asserts, federal agencies that utilize the SIC, such as the Securities Exchange Commission, classify Dish as a "Cable and Other Pay Television Service[]," rather than as a "Radio Broadcasting Station[]" or a "Television Broadcasting Station[]." Id. at 24-25.

Addressing Dish's arguments in reverse order, we reject Dish's assertion that the commonly understood definition of the term "broadcasting" can be gleaned from the SIC system. The SIC system was established by the federal government in the 1930s as a "structure for the collection, presentation, and analysis of the U.S. economy," North Am. Indus. Classification Sys. at Bureau of

25

Labor Statistics, www.bls.gov/bls/naics.htm (last visited Nov. 13, 2014), and it utilizes industry classifications of varying breadth.[3]  Dish presents no evidence or case law that would allow us to conclude that the classifications found within the SIC system are so well known or commonly employed that they can serve to define a term in a commercial general liability policy.

Likewise, the statutory definition of "broadcasting" in the Communications Act of 1934 (Act), see 47 U.S.C. § 153(7), and the FCC's 1987 "designation of subscription television and subscription direct broadcast satellite services as not being broadcasting within the meaning of the Act," Nat'l Ass'n For Better Broad., 849 F.2d at 666, are of little value in this case.  The Act defines "broadcasting" as "the dissemination of radio communications intended to be received by the public, directly or by the intermediary of relay stations."  47 U.S.C. § 153(7).  For more than 50 years, the FCC, which was afforded a broad grant of authority under the Act to regulate radio and television communications, applied this definition to subscription radio and television services.  Nat'l Ass'n For Better Broad., 849 F.2d at 671 (Wald, J., dissenting).  In 1987, however, the FCC changed course and adopted the position that pay television services did not qualify as

_____

[3] Not surprisingly, Dish focuses on the most narrow of those classifications and ignores the broader classifications, which, in pertinent part, place it, along with radio and television broadcasting stations, within "Major Group 48: Communications."  U. S. Dep't of Labor, Occupational Safety & Health Admin., SIC Manual, available at https://www.osha.gov/pls/imis/sic_manual.html (last visited Nov. 13, 2014).

"broadcasting" under the Act.  Id.  The FCC's change of position was challenged in court and the D.C. Circuit, in a 2-to-1 decision, affirmed.  The panel majority in that case, in discussing the legislative history of the Act, noted as follows:

> Further review of the recorded debate and Senator Dill's involvement in it makes it plain that the Senators did not purport to be using the term "broadcasting" in any technical sense . . . .  It must be presumed that the Senators, like most of the rest of us, at times use "broadcasting" not in its statutorily defined sense, as [specifically defined in the Act], but as if it were synonymous with "transmission."

Id. at 669.  In other words, despite affirming the FCC's conclusion that pay television services did not qualify as "broadcasting" under the Act, the panel majority effectively conceded that the Act's definition of "broadcasting" was "technical" and considerably more narrow than the commonly understood definition of that term.  Id.  Thus, the Act's statutory definition of "broadcasting" and the FCC's interpretation and application of that statutory definition carry little weight in a case such as this, where our focus is on the commonly understood definition of the term "broadcasting."

That leaves only Dish's argument that the terms "broadcasting" and "telecasting" must be defined to require distribution of content to the public at large for free.  To address that argument, we turn to dictionary definitions of these terms.  See Mountain States, 296 P.3d at 1024.  The term "broadcast," as an adjective, is commonly defined as "cast or scattered in all directions . . . : widely diffused," Websters Third New Int'l Dictionary 280 (1993), "made public by

27

means of radio or television," id., and "[d]isseminated by means of radio or television," Oxford English Dictionary Online (OED), http://www.oed.com/view/Entry/23507 (last visited Nov. 13, 2014). Similarly, the term "broadcast," as a noun, is commonly defined as "a casting or scattering in all directions," "the act of making widely known: the act of spreading abroad," and "the act of sending out sound or images by radio or television transmission esp. for general reception." Websters, supra at 280. Finally, the term "broadcast," as a verb, is similarly defined as "to scatter or sow," id., "to make widely known: disseminate or distribute widely or at random," id., "to send out from a transmitting station (a radio or television program) for an unlimited number of receivers," id., and "[t]o disseminate (a message, news, a musical or dramatic performance, or any audible or visible matter) from a radio or television transmitting station to the receiving sets of listeners and viewers," OED, supra, http://www.oed.com/view/Entry/23508 (last visited Nov. 13, 2014).

The common definition of the term "telecast" appears to overlap that of the term "broadcast." In its noun form, the term "telecast" is commonly defined as "a broadcasting or a program broadcast by television." Websters, supra at 2349. In its verb form, the term "telecast" is commonly defined as "to broadcast by television." Id.

Even assuming that the terms "broadcasting" and "telecasting" include a "public" component, nothing in any of these common definitions of the terms

28

exclude fee-for-service transmissions. And that makes sense when one considers that subscription television service "shares most characteristics of traditional broadcasting, including its primary one—i.e., transmissions are directed toward 'as many people as can be interested in the particular program as distinguished from a point-to-point message service to specified individuals.'" Nat'l Ass'n For Better Broad., 849 F.2d at 677 (Wald, J., dissenting) (quoting Nat'l Ass'n of Broadcasters v. FCC, 740 F.2d 1190, 1201 (D.C. Cir. 1984)). Indeed, "[s]ubscription television providers," such as Dish, "obviously do not care about the identities of the particular individuals to whom their communications are transmitted; their real goal is to obtain revenues from any and all possible viewers." Id. at 678. "In that sense, they are just like newspaper publishers or movie producers—their products are aimed at the general public, so long as that public can pay." Id.; cf. Suburban Cable TV Co. v. Com., 570 A.2d 601, 609 (Pa. Commw. Ct. 1990) (concluding, in a case concerning state tax exemptions, that cable television providers were engaged in "broadcasting" because their "transmissions, both through the air and by cable, . . . involve[d] the dissemination of communications to the public").

Thus, in sum, we reject Dish's assertion that the terms "broadcasting" and "telecasting," as employed in the policies at issue, must be defined to exclude fee-for-service transmissions, such as those that Dish provides to its subscribers. To the contrary, we conclude that the commonly-understood definitions of the terms

29

"broadcasting" and "telecasting" undoubtedly encompass Dish's transmissions.

*e) The district court's consideration of Dish's broker's advice*

In granting summary judgment in favor of the Insurers on the basis of the policies' business exclusions, the district court also took into account evidence regarding advice given to Dish by its insurance broker. When Dish was shopping for insurance coverage in 2001 and 2002, it was advised by its insurance broker, The Lockton Companies (Lockton), that "'Personal Injury and Advertising Injury Coverage' for '[a]ny offense if the insured is in the business of advertising, broadcasting, or telecasting' [w]as one of several 'MAJOR EXCLUSIONS' in [its] commercial general liability coverage" and an item that warranted 'DISCUSS[ION].'" App. at 2495. In short, Lockton "explicitly warned D[ish] that it would not be covered for many injuries because of the Broadcasting Exclusion." Id. at 2503.

The district court concluded, for three reasons, that this "broker's advice" was "admissible under an exception to [Colorado's] four corners rule."[4] Id. First, the district court noted that "no party dispute[d] the veracity of the broker's statements." Id. at 2504. Second, the district court noted that "neither the elements of the charges brought in the underlying patent infringement complaint nor D[ish]'s defenses ha[d] anything to do with whether D[ish] [wa]s in the

---

[4] As we noted in DISH I, "Colorado courts adhere to a 'four corners rule' or 'complaint rule,' under which the courts compare the allegations of the underlying complaint with the terms of the applicable policy." 659 F.3d at 1015.

30

business of broadcasting." Id. Lastly, the district court noted that "application of the rule to exclude the broker's advice would defeat the Colorado Supreme Court's very object in creating the rule," id., i.e., to protect the insured's legitimate expectation of a defense. Indeed, the district court questioned "[h]ow. . . D[ish] [could] assert it had a 'legitimate' expectation of a defense when it was literally instructed *not* to expect a defense?" Id. (emphasis in original).

On appeal, Dish argues that the district court improperly drew inferences from Lockton's statements, and, under applicable Colorado law, should not have considered the Lockton evidence at all in determining whether the Insurers had a duty to defend Dish in the underlying RAKTL suit. We find it unnecessary to reach either of these arguments. Even assuming that the district court should not have considered the statements made by Lockton to Dish, its interpretation of the terms "broadcasting" and "telecasting" otherwise rests on firm ground.

*f) The overlapping meanings of broadcasting and telecasting*

In the course of granting summary judgment in favor of the Insurers, the district court concluded that "[t]he term 'telecasting' [wa]s included [in the policies at issue] to make clear that businesses involving the transmission of television programming (as opposed to only radio broadcasting, for example) to viewers are excluded from advertising injury coverage." App. at 2506. Dish challenges this point on appeal, arguing that the district court, "[b]y concluding that D[ish] is simultaneously engaged primarily in both 'broadcasting' and

31

'telecasting,' . . . rendered the Insured's Business Exclusion meaningless and contradictory." Aplt. Br. at 41 (internal quotation marks omitted). In support, Dish argues that if "the 'transmission of television programming' is already excluded by inclusion of the term 'broadcasting,' . . . the inclusion of the term 'telecasting' [is] superfluous." Id. In addition, Dish argues that it, "like all companies, can be engaged 'primarily' in only one business at any given time." Id.

Dish bases its arguments upon the rule of Colorado law that courts "must avoid reading an insurance policy so as to render some provisions superfluous." Gen. Sec. Indem. Co. of Ariz. v. Mountain States Mut. Cas. Co., 205 P.3d 529, 537 (Colo. App. 2009). Dish, however, would have us apply the rule so as to prevent any overlapping terms whatsoever in an insurance policy.[5] Because we are not convinced that this was the intent of the Colorado courts in adopting the rule, we decline to adopt Dish's position. Moreover, even assuming the terms "broadcasting" and "telecasting" have overlapping meanings, that does not render the business exclusion provisions of the policies superfluous. Rather, as the district court aptly noted, the record suggests that the Insurers, by using both of the terms at issue, were simply attempting "to make clear that businesses involving the transmission of television programming . . . to viewers [we]re

[5] Under Dish's position, for example, an automobile liability insurance policy could not use both the terms "vehicle" and "automobile" because they have overlapping meanings.

32

excluded from advertising injury coverage." App. at 2506. We therefore conclude the district court did not err in determining that Dish was engaged "primarily" in both "broadcasting" and "telecasting," given that these two terms have overlapping meanings.

*g) Conclusion*

For all of these reasons, we agree with the district court that Dish is engaged primarily in the business of "broadcasting" and "telecasting," and that, consequently, coverage for advertising injuries is unavailable under the policies at issue.

## 2. *The umbrella insurers*

Defendants Arch, National Union and XL are Dish's umbrella insurers. On remand, Dish conceded that Arch "had satisfied the requisites for applying [the] intellectual property exclusion" in its policy "and consented to the entry of summary judgment in Arch's favor." Aplt. Br. at 49. As for National Union and XL, the district court concluded that neither of them had a duty to defend Dish in the RAKTL action and thus granted summary judgment in their favor. In doing so, the district court noted that it was undisputed "that the CGL insurance policies issued by Travelers and Arrowood have not been exhausted by payments of claims to which the National Union and XL policies apply." Id. In addition, the district court concluded that "National Union and XL have no duty to defend because their policies, like those of the primary insurers, contain exclusions for

33

advertising injuries where the insurer is engaged in the business of 'broadcasting.'" Id. "Furthermore," the district court concluded, "National Union's policy contains a 'sole' causation requirement . . . that negates coverage." Id. at 2508. And lastly, the district court concluded that "National Union's Satellite Exclusion and XL's 'as warranted' provision also fail[ed] to provide coverage." Id.

In its appeal, Dish takes issue with these conclusions.

*a) XL's "as warranted" provision*

Dish argues that "the district court failed to apply the specific 'as warranted' language of the XL Policy correctly." Aplt. Br. at 51. In order to understand Dish's arguments on this point, it is necessary to review several provisions of the XL Policy. To begin with, the XL Policy contains two separate coverage provisions: (1) "Coverage A," which provides coverage for "those sums that the 'Insured' becomes legally obligated to pay as damages arising out of an 'occurrence' which are in excess of the underlying insurance stated in Schedule A of th[e] [XL] policy"; and (2) "Coverage B," which provides coverage "[w]ith respect to any loss covered by the terms and conditions of this policy, but not covered as warranted by the underlying policies listed on Schedule A, or any other underlying insurance." App. at 2048 (emphasis added). "The 'not covered[] as warranted' language of [this policy] establishes that [XL] must drop down for occurrences that are, in fact, covered by the underlying insurance policy

34

despite the wrongful denial of coverage by" the primary insurers. Hocker v. New Hampshire Ins. Co., 922 F.2d 1476, 1482 (10th Cir. 1991) (interpreting identical policy language). With respect to the duty to defend, the XL Policy states that "[w]e will defend any 'suit' seeking damages covered by this policy" "but not covered by any other insurance or underlying insurance." App. at 2048. Lastly, the XL Policy includes a number of specific exclusions, including what the parties refer to as "Exclusion O," which states as follows: "This insurance does not apply to . . . [a]ny defense, investigation, settlement or legal expense covered by underlying insurance." Id. at 2055-57.

The district court concluded that, in light of Exclusion O, "the XL Policy is not required to drop down and provide primary coverage even if Arrowood's denial of coverage was wrongful." Id. at 2515. Dish now argues on appeal that "[t]he district court's application of the 'as warranted' provision and Exclusion O renders them meaningless and contradictory." Aplt. Br. at 52 (internal quotation marks omitted). In support, Dish asserts that "[t]he district court . . . reads the [Exclusion O] defense provision as relieving XL of responsibility for any defense covered by underlying insurance even if the underlying insurer wrongfully denies coverage." Id. "Thus," Dish argues, "contrary to even the district court's reading of the 'as warranted' provision, XL will never be obliged to drop down and defend when the underlying insurer wrongfully denies coverage." Id.

We need not decide whether the district court erred in interpreting

35

Exclusion O because we conclude that XL has no obligation under either of the coverage provisions of its policy to defend Dish in connection with the RAKTL action. More specifically, there is no excess coverage or related duty to defend under the "Coverage A" provision of the XL policy because, in light of the business exclusions we have already discussed, the underlying insurers have no obligation to indemnify or defend Dish in the RAKTL action. As for the "Coverage B" provision of the XL policy, its "not covered as warranted" language clearly refers to situations where the underlying policies on Schedule A were supposed to provide coverage, but the underlying insurers wrongfully denied coverage and thus did not actually pay to defend or indemnify the insured. Because the underlying insurers in this case have no obligation to indemnify or defend Dish in the RAKTL action, XL has no obligation to provide drop-down coverage to Dish.

*b) The National Union "sole causation" requirement*

The "Coverage" provision of the National Union Policy states, in pertinent part, that "[w]e will pay on behalf of the **Insured** those sums in excess of the Retained Limit that the **Insured** becomes legally obligated to pay by reason of liability imposed by law . . . because of . . . **Advertising Injury** that . . . is caused by an **Occurrence**." App. at 1167 (emphasis in original). The National Union Policy defines "Advertising Injury," in pertinent part, as "injury arising solely out of your advertising activities." Id. at 1169. The National Union Policy also

36

defines "Occurrence," in pertinent part, in the following manner: "As respects **Advertising Injury**, an offense committed in the course of advertising your goods, products and services that results in **Advertising Injury**." Id. at 1171 (emphasis in original).

The district court concluded that "[t]he complaint filed in the [RAKTL] Action d[id] not allege injury 'arising solely out of' the Dish parties' advertising activities." Id. at 2510. Rather, the district court concluded, the RAKTL action alleged "injuries outside of advertising," including Dish's pay-per-view ordering and its performance of customer service functions. Id. The district court also rejected Dish's assertion "that the sole causation requirement conflicts with the requirement in the definition of Occurrence [in the National Union Policy] that provides that the offense must be committed in the course of advertising the named insured's goods, products, or services." Id. at 2510-11.

On appeal, Dish argues that "[t]he District Court erred by finding that conflicting causation provisions," i.e., the definitions of "Advertising Injury" and "Occurrence," "within the National Union policy could be harmonized and construed in favor of the insurer, when Colorado law requires conflicting provisions 'to be construed against the insurer and in favor of coverage to the insured.'" Aplt. Br. at 52 (quoting Simon v. Shelter Gen. Ins. Co., 842 P.2d 236, 239 (Colo. 1992)). More specifically, Dish argues that "the district court misapplied the law and misread the National Union Policy when it held that the

'occurrence' definition modifies the offense, not the injury." Id. at 54.

We disagree. In order for coverage to exist under the National Union Policy, there must be liability imposed on Dish "because of Advertising Injury . . . caused by an Occurrence." App. at 1167. As noted, an "Occurrence" means "an offense committed" by Dish "in the course of advertising [its] goods, products and services that results in Advertising Injury." Id. at 1171. In turn, "Advertising Injury" means an "injury arising solely out of your advertising activities." Id. at 1169. Construed together, "Dish must have committed an offense in the course of advertising that caused RAKTL injury," and "[t]hat offense, in turn, must be the sole cause of RAKTL's injury." Aplee. Br. at 65. This interpretation, which allows all of the provisions of the National Union Policy to be read in harmony and in accordance with their plain language, must prevail over Dish's attempt to create a conflict. See generally Farmers Ins. Exchange v. Anderson, 260 P.3d 68, 83 (Colo. App. 2010) ("In determining whether there is an ambiguity in a policy provision, we evaluate the policy as a whole and construe the language in harmony with the plain meaning of the words employed.").

### 3. Liability for damages, costs and fees

In its final issue on appeal, Dish argues that, "[a]s a direct result of the Primary Insurers' wrongful denial of a defense, [it] was forced to defend itself simultaneously against the claims asserted in the [RAKTL action] and to

prosecute this insurance coverage action." Aplt. Br. at 55. "Under Colorado law," Dish argues, it "is entitled to an award of general and consequential damages, including the costs and attorneys' fees incurred in both actions." Id.

These arguments can be disposed of quickly. Because the district court correctly concluded that none of the Insurers were obligated to defend Dish in the RAKTL action, Dish is not entitled to damages, costs or fees incurred in defense of the RAKTL action or in the pursuit of its insurance coverage claims.

## III

The judgment of the district court is AFFIRMED.