20-0268-cv
*Dish Network Corp. v. Ace Am. Ins. Co.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————

August Term 2020

(Argued:     April 22, 2021          Decided:     December 22, 2021)

Docket No. 20-0268-cv

———————————

DISH NETWORK CORPORATION, DISH NETWORK L.L.C.,

*Plaintiffs-Counter-Defendants-Appellants*,

*v.*

ACE AMERICAN INSURANCE COMPANY,

*Defendant-Counter-Claimant-Appellee*.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————

Before:     WALKER, LEVAL, and CHIN, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the

Southern District of New York (Carter, *J.*), entered December 27, 2019, holding

that insurance company was not obligated under an insurance policy to defend

insureds in underlying copyright infringement suits. The parties submitted

cross-motions for summary judgment on the issue of whether the insureds were subject to the policy exclusion for injury purportedly caused by an insured in the business of "broadcasting" or "telecasting." The district court held that the exclusion applied, and it therefore dismissed the insureds' claim for a declaratory judgment that the insurance company had a duty to defend. The insureds appeal.

AFFIRMED.

--------

ERIC A. SHUMSKY (Benjamin F. Aiken, Ethan P. Fallon, and Sarah H. Sloan, *on the brief*), Orrick, Herrington & Sutcliffe LLP, Washington, D.C., *and* Lee M. Epstein and Matthew A. Goldstein, Flaster Greenberg P.C., Philadelphia, Pennsylvania, *for Plaintiffs-Counter-Defendants-Appellants*.

JOHNATHAN D. HACKER (Bradley N. Garcia and Ephraim A. McDowell, *on the brief*), O'Melveny & Myers LLP, Washington, D.C., *and* Adam Ira Stein (Terri A. Sutton, *on the brief*), Cozen O'Connor, New York, New York, *and* Seattle, Washington, *for Defendant-Counter-Claimant-Appellee*.

--------

CHIN, *Circuit Judge*:

Plaintiffs-counter-defendants-appellants Dish Network Corporation and its wholly owned subsidiary Dish Network L.L.C. (together, "DISH") provide satellite television products and services. DISH obtained a commercial general liability insurance policy from defendant-counter-claimant-appellee Ace American Insurance Company ("ACE") that included coverage for "personal and advertising" liability subject to certain exclusions. One such exclusion, Exclusion j (the "Media Exclusion"), excluded from coverage any liability arising from "'[p]ersonal and advertising injury' committed by an insured whose business is . . . [a]dvertising, broadcasting, publishing or telecasting." Joint App'x at 624.

After DISH was sued by four television networks in separate lawsuits for alleged copyright infringement, DISH requested coverage from ACE pursuant to its insurance policy. ACE denied coverage and refused to defend, relying on, *inter alia*, the Media Exclusion, arguing that DISH was in the business of "broadcasting." The networks' lawsuits settled without DISH incurring any monetary liability, but DISH incurred legal fees and other expenses in defending the lawsuits. DISH brought this action in the district court, claiming that ACE

3

breached its duty to defend by failing to either defend DISH or reimburse its defense expenditures incurred in the underlying lawsuits.

The district court granted ACE summary judgment, holding that ACE had no duty to defend DISH because DISH was subject to the Media Exclusion. The court rejected DISH's argument that "broadcasting" requires transmission to the public for free, rather than for a fee, concluding that the plain and ordinary meanings of "broadcasting" and "telecasting" include subscription-based broadcasting, like that provided by DISH.

For the reasons discussed below, we AFFIRM.

## BACKGROUND

### I. *The Facts*

The facts are largely undisputed and are summarized in the light most favorable to DISH.

By its own description, DISH "is a subscription-based television provider that transmits programming to its paying customers." Appellants' Br. at 6. According to its Articles of Incorporation, DISH was formed "[t]o engage in the business of satellite communications, including but not limited to Direct Broadcast Satellite communications: to own, sell, hold, lease, equip, maintain

4

and operate transmission and receiving stations and any connection between any such stations, and to transmit, signals, and all matter and things of any kind, nature, and description whatsoever that may be transmitted." Joint App'x at 129.

Beginning in 2004, DISH purchased a yearly commercial general liability ("CGL") policy from ACE. For the period from August 1, 2011 to August 1, 2012, ACE issued CGL Policy No. XSL G25531309 (the "Policy") to DISH.

The Policy included coverage for bodily injury and property damage liability ("Coverage A") and personal and advertising injury liability ("Coverage B"). It defined "personal and advertising injury" to include injury arising out of "[i]nfringing upon another's copyright, trade dress or slogan in [an] 'advertisement.'" *Id.* at 634.[1] Coverage B contained the Media Exclusion, which excluded coverage for liability arising from "'[p]ersonal and advertising injury' committed by an insured whose business is . . . [a]dvertising, broadcasting, publishing or telecasting." *Id.* at 624.

DISH's insurance broker, Denver Series of Lockton, LLC ("Lockton"), reviewed the Policy and noted the Media Exclusion. Lockton recommended that

---

[1]	Coverage B's "personal injury" liability is distinct from Coverage A's "bodily injury" liability, which is defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." *Id.* at 632.

DISH purchase "Broadcasters Errors & Omissions" insurance to cover DISH's "liability as a broadcasting professional[]," including for "unintentional errors you made in advertising or programming you produced or broadcasted as a professional broadcaster." *Id.* at 307. DISH declined to purchase such a policy.

In May 2012, four major television networks sued DISH, alleging breach of contract and copyright infringement in connection with DISH's "Hopper" product, a digital video recording service that during play-back automatically skips "advertisements within the television networks' copyrighted works." *Id.* at 1143, 1145.[2] The networks sought to enjoin DISH from marketing and distributing the Hopper. Although the lawsuits were settled without DISH making any monetary payments, DISH sought coverage from ACE for expenses incurred in the defenses.

On July 31, 2012, ACE advised DISH that it had no duty to cover the expenses under the Policy because the Media Exclusion bars coverage "if the insured is involved in the business of broadcasting or telecasting," and, in ACE's

---

[2] The four network lawsuits were *DISH Network L.L.C. v. Am. Broadcasting Cos., Inc. (In re Autohop Litig.),* No. 12-cv-4155 (S.D.N.Y.); *CBS Broadcasting Inc. v. DISH Network Corp.,* No. 12-cv-6812 (S.D.N.Y.); *Fox Broadcasting Co. v. DISH Network LLC,* No. 12-cv-4529 (C.D. Cal.); and *NBC Studios, LLC v. DISH Network Corp.,* No. 12-cv-4536 (C.D. Cal.).

view, DISH was "involved in the broadcasting" of the four networks'

programming. *Id.* at 1163.

## II.     *Procedural History*

On May 28, 2016, DISH sued ACE in the district court, alleging that

ACE breached its duty to defend DISH in the network lawsuits.  On March 18,

2019, after discovery, ACE and DISH cross-moved for summary judgment, with

both parties focusing on whether DISH was in the business of "broadcasting."

The district court granted summary judgment for ACE, holding that

ACE had no duty to defend DISH because DISH was in the business of

"broadcasting" and "telecasting" under the Media Exclusion.  *Dish Network Corp.*

*v. ACE Am. Ins. Co.*, 431 F. Supp. 3d 415, 431 (S.D.N.Y. 2019).[3]  The court rejected

DISH's contention that "broadcasting" requires transmission of "programming to

the public at large for free," rather than for a fee, and held that "[t]he plain and

ordinary meaning of the terms 'broadcast' and 'telecast' encompass a

subscription-based broadcasting service" like that of DISH.  *Id.* at 429.  Judgment

was entered December 27, 2019.  This appeal followed.

---

[3]     As part of its analysis of the terms "broadcasting" and "telecasting," the district court found that the definition of "telecast" "necessarily encompasse[d] broadcasting," and that therefore the definition of '"telecast" in the Policy overlapped with the definition of "broadcast."  *Id.* at 429.

## DISCUSSION

**I.**     *Applicable Law*

**A.**     *Construction of Insurance Policies*

Under New York law, "an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract." *Parks Real Est. Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (internal quotation marks omitted). Unambiguous provisions of an insurance policy are to be given their "plain and ordinary meaning," and the plain and ordinary meaning of words may not be disregarded to find an ambiguity where none exists. *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 567 (2d Cir. 2011) (internal quotation marks omitted). Where the intent of the parties is clear based on the "plain and ordinary meaning" of the contractual terms, summary judgment may be appropriate. *Id.* Courts may refer to the dictionary to determine the "plain and ordinary meaning" of contract terms. *Id.*

A contractual term is ambiguous "if reasonable minds could differ as to [the] meaning" of the term. *Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691, 695 (2d Cir. 1998). "Ambiguity is determined by looking within the four corners of

8

the document, not to outside sources."  *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (internal quotation marks omitted).  Where "resolution of a dispute turns on the meaning of an ambiguous term or phrase," summary judgment should usually be denied.  *Fed. Ins. Co.*, 639 F.3d at 567.

An insurer wishing to exclude coverage under its policy "must do so in clear and unmistakable language," and "[a]ny such exclusions or exceptions . . . must be specific and clear in order to be enforced."  *Beazley Ins. Co. v. ACE Am. Ins. Co.*, 880 F.3d 64, 69 (2d Cir. 2018) (internal quotation marks omitted).  "[A]n insurer bears the burden of proving that an exclusion applies."  *Ment Bros. Iron Works Co. v. Interstate Fire & Cas. Co.*, 702 F.3d 118, 121 (2d Cir. 2012).  If the insurer does so, "the burden shifts to the insured to demonstrate that an exception to the exclusion applies."  *Id.* at 122 (internal quotation marks omitted).

Many CGL policies contain coverage exclusions for advertising injuries, including a "media exclusion" that applies to insureds in media-and-internet-type businesses.  *See* 9A Steven Plitt et al., Couch on Insurance § 129:37 (3d ed. 2021); Laura J. Grabouski, *Current Controversies over Personal and Advertising Injury Coverage*, Ins. Coverage Litig., July-Aug. 2014, at [15]

(discussing coverage exclusions for insureds in media-and-internet-type businesses in CGL policies that provide advertising injury "coverage for specifically defined torts that cause purely economic losses").  Some insurance companies include the media exclusion in their policies to limit their exposure to "mass media-type injuries."  *DISH Network Corp. v. Arch Specialty Ins. Co.*, 989 F. Supp. 2d 1137, 1148 (D. Colo. 2013), *aff'd sub nom. DISH Network Corp. v. Arrowood Indem. Co.*, 772 F.3d 856 (10th Cir. 2014).

B.    *Standard of Review*

"We review a district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor."  *Fed. Ins. Co.*, 639 F.3d at 566 (internal quotation marks omitted).  "Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law."  *Id.* (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(a).  When both parties have moved for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences

10

against the party whose motion is under consideration." *Coutard v. Mun. Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017) (internal quotation marks omitted).

These generally applicable rules can function somewhat differently in relation to insurance policies, and in particular in relation to an insurer's duty to defend the insured. Regardless of whether the motion for summary judgment is made by the insurer or the insured, ambiguities as to coverage are generally construed against the insurer, in accordance with the doctrine of *contra proferentem*. *See Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 615 (2d Cir. 2001). And the insurer is bound to defend its insured until such time as any ambiguity as to coverage is resolved in the insurer's favor. *See id.* at 620-22. "Whether the language of an insurance policy is ambiguous is a question of law, which we review *de novo*." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 201 (2d Cir. 2010). If the language is ambiguous, then "resolution of the ambiguity is for the trier of fact." *State v. Home Indem. Co.*, 66 N.Y.2d 669, 671 (1985); *see also Fed. Ins. Co.*, 639 F.3d at 567 (same).

## C.   *Prior Cases*

The issue of whether DISH is in the business of "broadcasting," and therefore subject to the Media Exclusion, has been presented to three courts, with

11

differing results.  In the first case, DISH sought a declaratory judgment from a court in the District of Colorado that its insurers had a duty to defend it in an underlying patent infringement action.  *Arch Specialty Ins. Co.*, 989 F. Supp. 2d at 1141-43.  Each of the insurers' "advertising injury" liability coverage incorporated a media exclusion against injuries caused by insureds in the business of "broadcasting."  *Id.* at 1145.[4]  The district court held that DISH was in the business of "broadcasting," within the plain meaning of the word, rejecting DISH's argument that its transmissions to paying subscribers was not "broadcasting."  *Id.* at 1146-48.  It thus granted summary judgment in favor of the insurers.  The Tenth Circuit affirmed, holding that "the commonly-understood definitions of the terms 'broadcasting' and 'telecasting' undoubtedly encompass[ed]" DISH's transmissions.  *Arrowood*, 772 F.3d at 872, 876.

A few months before the Tenth Circuit's decision, a court in the Central District of Illinois reached the opposite conclusion.  *See Travelers Prop. Cas. Co. of Am. v. DISH Network, LLC*, No. 12-cv-3098, 2014 WL 1217668, at *15 (C.D. Ill. Mar. 24, 2014).  There, the insurer sought a declaratory judgment that it had no duty to defend DISH in an underlying lawsuit for DISH's alleged role in

---

[4]    The district court referred to the exclusion as the "business exclusion."

making unsolicited telemarketing phone calls to consumers. *Id.* at \*2. The insurer's "advertising injury" coverage also excluded injuries caused by insureds in the business of "broadcasting." *Id.* at \*3-4.[5] The district court held that the term "broadcasting" was ambiguous because it was unclear whether it encompassed businesses that transmitted only to paid subscribers. *Id.* at \*9-11. It also found the district court's contrary holding in *Arch Specialty Insurance Co.* was belied by *Webster's New World Telecom Dictionary*, which provided two meanings of the term "broadcasting" as a transmission sent "either for 'all receivers' or for 'only subscribers.'" *Id.* at \*9, \*11. The district court granted DISH summary judgment, *id.* at \*15, and the case subsequently settled without appeal.

## II.  *Application*

We conclude that ACE does not owe DISH a duty to defend under the Policy. First, "broadcasting," as used in its Media Exclusion, is not ambiguous and applies to DISH's business.[6] Second, DISH's argument that the plain and ordinary meaning of "broadcasting" does not apply here fails.

---

[5]   The district court referred to the exclusion as the "broadcasting exclusion."

[6]   Because we conclude that DISH is in the business of broadcasting, we need not consider whether DISH is also in the business of "telecasting," or the extent to which the two terms overlap.

## A.     *The Plain and Ordinary Meaning of "Broadcasting"*

The Media Exclusion excluded coverage for liability arising from "personal and advertising injury" committed by "an insured whose business is . . . broadcasting."

The Policy does not define "broadcasting," and so we discern its plain and ordinary meaning by looking to the dictionary. *See Fed. Ins. Co.*, 639 F.3d at 567. Here, the Policy employs the term "broadcasting" as either a verb or a noun. As a verb, "broadcasting" -- or "broadcast" -- means "to make widely known : disseminate or distribute widely," "to send out from a transmitting station (a radio or television program) for an unlimited number of receivers," or "to send out radio or television signals." *Broadcast*, *Webster's Third New International Dictionary, Unabridged* (2002). As a noun, it is defined as "the act of sending out sound or images by radio or television transmission esp. for general reception." *Id.*

These definitions make clear that the term "broadcast," put simply, means transmitting a signal, especially a radio or television signal, to some number of receivers -- which is precisely the nature of DISH's business. DISH transmits encrypted television signals to any receiver matched to its transmitters

14

and charges its subscribers a fee to decrypt the signal. *See* Joint App'x at 861 ("DISH . . . transmit[s] [television] programming via satellite to paying subscribers.") (report of DISH expert Frank Washington); *id.* at 205 (DISH "tak[es] the signal of programmers . . . and transmit[s] . . . them via satellite to subscribers for a fee.") (deposition of DISH representative Jeffrey Blum). Accordingly, in the common, everyday sense of the word, DISH is in the business of "broadcasting."

DISH rejects this plain meaning of the word "broadcasting" and argues that "broadcasting" applies only to the transmission of programming to the public for free, while it provides its programming only to paying subscribers with special receivers. This distinction, DISH argues, means that its transmissions are not "public," "for general reception," or "for an unlimited number of receivers," as indicated in the common dictionary definitions. Appellants' Br. at 31-32.

The line that DISH seeks to draw -- between free transmissions and transmissions to paid subscribers -- is not reflected in the common use of the term "broadcast." As the Tenth Circuit observed, "nothing in any of these common definitions of the term[] exclude[s] fee-for-service transmissions." *Arrowood*, 772 F.3d at 871. A service need not be free to be available to the public.

Examples abound of services that are available to the public for a fee, including public transportation, shipping and mailing services, and parks or other venues that charge an admittance fee. Indeed, there is nothing in the dictionary definitions to suggest that "broadcasting" only encompasses broadcasting for free; the fact that DISH must add the "for free" qualifier to the definitions makes clear that no such requirement exists. *See id.* at 872; *Arch Specialty Ins. Co.*, 989 F. Supp. 2d at 1147-48.

**B.** *DISH's Rejection of the Plain and Ordinary Meaning*

DISH argues that the "plain and ordinary" meaning of "broadcasting" does not apply here because (1) the Policy describes its business as "[c]ommunication," and (2) a technical or specialized definition of "broadcasting" applies. We are not persuaded.

First, DISH points to the Policy's description of its business as "[c]ommunication," Joint App'x at 610, and argues that it is thus not a broadcasting business subject to the Media Exclusion. The purpose of the Policy's "Business of Insured" provision, however, is to provide a "general identification of [DISH's] operations." *Id.* at 812. DISH cites no authority for the proposition that the description of the "Business of Insured" must be exhaustive

16

or that it must match any other reference within the Policy to the insured's business. Entities may be involved in various businesses, and each of those businesses may be accurately described in different ways. Furthermore, DISH's argument makes no sense because broadcasting is unquestionably communication, regardless of whether a fee is charged. "Communication" is defined as "the act or action of . . . transmitting." *Communication, Webster's Third New International Dictionary, Unabridged* (2002); *see also Communication, American Heritage Dictionary, Second College Edition* (1991) (defining communication as "[t]he exchange of . . . messages, or information, as by . . . signals"). "Broadcasting," or the transmission of signals to receivers, is plainly a form of communication.

DISH argues that ACE's underwriting file for the Policy shows that ACE used the term communication in a more limited sense to refer to "businesses engaged in communications or telecommunications *equipment manufacturing*." Joint App'x at 1036 n.21. The underwriting file, however, is extrinsic evidence, and thus we do not consider it because the Media Exclusion is not ambiguous. Moreover, the underwriting file does not purport to categorize DISH's business exhaustively or exclusively as equipment manufacturing. DISH also does not

17

contend that it is solely in the business of equipment manufacturing or dispute that its business involves the transmission of signals to its subscribers. ACE's underwriting file and the Policy's declarations page's use of the term "[c]ommunication" in no way suggest that DISH is not in the business of "broadcasting." DISH is in the business of both "communications" and "broadcasting," and therefore is subject to the Media Exclusion.

Second, DISH contends that industry sources support its definition of the term "broadcasting," including telecommunications dictionaries, Federal Communications Commission (the "FCC") regulations, and definitions under the Federal Communication Act (the "FCA"). But these sources provide technical, industry-specific definitions of terms, and New York law is clear that we do not assign a "narrow, technical definition," *Michaels v. City of Buffalo*, 85 N.Y.2d 754, 757 (1995) (internal quotation marks omitted), to a term in an insurance policy that does not indicate that the term is meant to have a specialized meaning, *see Christodoulides v. First Unum Life Ins. Co.*, 946 N.Y.S.2d 773, 776 (4th Dep't 2012).

Here, the Policy does not indicate that "broadcasting" was intended to have a specialized or technical meaning, and the technical sources to which DISH would have us look do not govern where the issue depends on the

"commonly understood definition of the term 'broadcasting.'" *Arrowood*, 772 F.3d

at 871. Furthermore, where the parties to this Policy intended to incorporate a

legal or statutory definition of a term, the Policy says so explicitly. For example,

Coverage A's Exclusion s indicates that terms such as "source material" and

"special nuclear material" should "have the meanings given them in the Atomic

Energy Act of 1954 or in any law amendatory thereof." Joint App'x at 622. If the

parties had intended "broadcasting" to take on a definition assigned by the FCC

or the FCA, they could have easily pointed to those sources. The language of the

Policy does not suggest an intention to adopt a specialized definition of

"broadcasting."[7]

---

[7]    DISH also claims to find support in an industry-specific definition of "broadcast television" as "[t]elevision programming sent over the air to all receivers," *Broadcast Television*, *Webster's New World Telecom Dictionary* (Ray Horak ed., 2008), on the theory that it does not transmit programming to *all* receivers. We are not persuaded. To begin, if this definition were to be literally applied, there would be no such thing as "broadcast television" because there is no programming that is received by "all receivers." A transmission can be received only by those receivers equipped to receive it. Indeed, many industry-specific definitions explicitly include the type of transmissions DISH sends. *See, e.g.*, *Broadcast*, *Hargrave's Communications Dictionary* (2001) (explaining that a "broadcast signal may be encrypted so that only selected groups of receivers may recover usable information from the signal"); *Broadcast*, *A/V A to Z: An Encyclopedic Dictionary of Media, Entertainment and Other Audiovisual Terms* (2010) (defining "broadcast" as "[t]o transmit an electronic signal (generally radio or television) from a central point to multiple, simultaneous recipients (listeners or viewers)," and using "satellite broadcast" -- DISH's technology -- as an example); *Broadcasting*, *Dictionary of Media and Communications* (2009) (using "Direct Broadcast Satellite" as an example of a "[b]roadcasting technolog[y]"); *Broadcast*, *Newton's Telecom Dictionary* (24th ed. 2008)

19

Accordingly, we reject DISH's invitation to discard the plain and ordinary meaning of the term "broadcasting" in favor of its preferred definitions. The district court did not err in granting summary judgment to ACE.[8]

## *CONCLUSION*

For the reasons set forth above, the judgment of the district court is AFFIRMED.

---

(defining "broadcast" as "[t]o send information to two or more receiving devices simultaneously -- over [*inter alia*] satellite system").

[8] DISH and ACE each make arguments as to why extrinsic evidence favors their definition of "broadcasting." Because we conclude that the definition of "broadcasting" is not ambiguous, we do not consider the extrinsic evidence. *See Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998).