21-1002-cv
*Truitt v. Salisbury Bank and Trust Co.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

―――――――――――

August Term 2021

(Argued:     June 1, 2022        Decided:     October 27, 2022)

Docket No. 21-1002-cv

―――――――――――

WILLIAM GUNNAR TRUITT,

*Plaintiff-Appellant,*

*v.*

SALISBURY BANK AND TRUST COMPANY *and*

SALISBURY BANCORP, INC.,

*Defendants-Appellees.*

―――――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

―――――――――――

Before:

LEVAL, CHIN, and MENASHI, *Circuit Judges.*

―――――――――――

Appeal from a judgment of the United States District Court for the

Southern District of New York (Román, *J.*), dismissing plaintiff-appellant's

complaint and an order denying his motion for reconsideration. Plaintiff-appellant brought this employment action, claiming that defendants-appellees discharged him in violation of New York Labor Law § 201-d because he chose to campaign for election to a seat in the New York State Assembly. The statute bars an employer from discriminating against an employee for engaging in, *inter alia*, certain outside political activities, including running for public office. The district court granted defendants-appellees' motion for summary judgment, holding that plaintiff-appellant voluntarily resigned and was not constructively discharged.

VACATED AND REMANDED.

---

ROBERT B. LOWER (Theodore McCullough III, *on the brief*), McCullough Ginsberg & Partners LLP, New York, New York, *for Plaintiff-Appellant*.

AMBER M. SPATARO (Jennifer I. Fischer, *on the brief*), Littler Mendelson P.C., Newark, New Jersey, *for Defendants-Appellees*.

---

CHIN, *Circuit Judge*:

In this case, plaintiff-appellant William Gunnar Truitt, an employee of defendant-appellee Salisbury Bank and Trust Company (the "Bank"),

announced his candidacy for a New York State Assembly seat. The Bank thereafter advised Truitt that he had to choose between running for office and continuing his employment with the Bank. Truitt decided not to discontinue his campaign, and his employment with the Bank ended.

Truitt brought this action below, contending that the Bank violated New York Labor Law § 201-d by requiring him to cease protected political activity as a condition of retaining his employment at the Bank. The statute makes it unlawful for an employer to discharge or discriminate against an employee for engaging in, *inter alia*, specified political activities outside of working hours. N.Y. Lab. Law § 201-d(2)(a). Protected activities expressly include "running for public office." *Id.* § 201-d(1)(a)(1). The district court granted summary judgment in favor of the Bank, concluding, as a matter of law, that because Truitt voluntarily resigned from his position and was not constructively discharged, his suit could not succeed. The court thereafter denied Truitt's motion for reconsideration, and this appeal followed.

For the reasons discussed below, we vacate the judgment and remand.

## BACKGROUND

### A. *The Facts*[1]

On February 26, 2018, Truitt, a part-time Dutchess County legislator, began working for the Bank as a full-time mortgage lending officer trainee. As a trainee, Truitt began a six-month training program, to be followed by a four-month secondary training program. Upon successful completion of both programs, Truitt would be promoted to a full-time mortgage loan officer position in January 2019. Truitt's employment with the Bank was at-will, and both he and the Bank could "terminate the employment relationship at any time, for any *legal* reason, with or without cause, with or without notice." Joint App'x at 390 (emphasis added).

On April 12, 2018, Truitt announced on Facebook that he was running as a Republican candidate in the upcoming election for the New York State Assembly seat in the 106th District. Candidates elected to the New York

---

[1] On January 28, 2020, Truitt filed his opposition papers in response to Salisbury's motion for summary judgment. Truitt failed to comply with Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York because he did not include a compliant counterstatement. *See* S.D.N.Y. Ct. R. 56.1(b), (c). In the absence of a compliant response, the district court drew the facts from Salisbury's Local Rule 56.1 Statement to the extent that its factual assertions were supported by the record. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73-74 (2d Cir. 2001). We do likewise.

State Legislature serve as part-time legislators during the legislative session, which lasts from January to June, in Albany, New York. Truitt did not let the Bank know he decided to run for the seat before he made the announcement.

The next day, after learning about the campaign announcement, Truitt's supervisor Amy Raymond asked Truitt to meet with her and Doug Cahill, the Bank's Vice President of Human Resources. In its Rule 56.1 Statement, the Bank stated that Raymond and Cahill sought to "determine what kind of time commitment such a campaign (and subsequently job) would entail." *Id.* at 268. Evidence the Bank cited in support of this description does not show that Raymond and Cahill expressed concerns about the time Truitt would spend campaigning, as distinct from the time he would spend discharging the duties of an Assembly member. *E.g.*, Joint App'x at 95 (Truitt testifying, during his deposition, that Raymond and Cahill "asked me to please provide them with a letter of explanation as to what I was running for"); *id*. at 126-27 (Cahill testifying, during his deposition, that a Bank senior vice president, Shelly Humeston, "knew the time commitment at least, the significance of the role, and we needed to find out whether or not it was going to be a conflict").

The Bank has internal policies and procedures concerning outside employment opportunities for its employees. The Bank's January 2018 Employee Handbook, for instance, explains that an employee who wishes to accept outside employment must "first notify the Human Resource Administrator or the President." *Id.* at 377. Outside employment, as the Bank's Code of Ethics and Conflicts of Interest Policy also provides, is then permitted only if it is approved in advance by the Board of Directors (or in the case of a non-officer employee, executive management). When deciding whether to approve the employment request, the Board of Directors will consider, *inter alia*, if the outside employment will "interfere with work assignments or performance." *Id.* at 222.

Three days later, on April 16, 2018, Truitt emailed Raymond and Cahill a letter "regarding [his] candidacy in this November's elections." *Id.* at 311. Although the letter stated he was not yet an official candidate on the ballot for the Assembly seat for the 106th District, it explained that he was "on the path" to becoming one, and that he was "officially endorsed" by the Dutchess County Republican Committee. *Id.* at 312. The letter described the part-time nature of the position, included a copy of the "New York State Legislative Session Calendar for 2018," and attached a link to the state's "Standards of Conduct

Relating to Outside Employment or Business Activity." *Id.* at 312-13. Truitt's letter also explained that he had spoken "with numerous state elected officials and other experienced individuals that are familiar with working in the State Assembly," and that they "made very clear that [he] w[ould] be able to maintain full-time work and be very successful in [his] role as a Mortgage Loan Originator [at] [the] [B]ank while serving as Assemblyman." *Id.* at 312. He also said that, if elected, he planned to no longer serve as a county legislator and would instead dedicate that role's time to his positions as an assemblymember and at the Bank.

The Bank apparently construed Truitt's notification of his candidacy as a request for approval for outside employment. Raymond, Cahill, and the Bank's CEO, Richard Cantele, reviewed Truitt's submission and determined that he would be unable to work both as an assemblymember and a mortgage lending officer. They were concerned that: (1) if Truitt was elected, he would have to be in Albany two to four business days per week during the six-month legislative session; (2) he had only 21 days of paid time off per year; (3) the Riverside Division that Truitt was hired to serve was an emerging residential lending market that would require a significant time commitment; and (4) residential lenders like Truitt often worked more than 50 hours per week. In

short, Raymond, Cahill, and Cantele concluded that Truitt could not devote sufficient hours to his future Bank position if he were elected as an assemblymember. Despite these concerns relating to the demands that would be made on Truitt's time if he *served* as a member of the Assembly, Cantele did not have any information that Truitt's *campaign* was or would be interfering with Truitt's ability to do his job at the Bank. Nor did Cantele receive any information suggesting that Truitt's campaign would affect his working hours.

On or around April 26, 2018, Cahill met with Truitt to discuss his campaign. During the meeting, Cahill explained that "the Bank was concerned that [Truitt] could not effectively fulfill the requirements and responsibilities of his future [mortgage lending officer] position as well as the requirements and responsibilities of a State Assembly seat and, therefore, the Bank's management would not provide [him] an exception to the Bank's policy on outside employment." *Id.* at 270-71.[2] Cahill then told Truitt that "he needed to make a decision on whether he was going to run or not and [to] let [the Bank] know" by May 1, 2018. *Id.* at 125.

---

[2]    Cahill also told Truitt that he had approached Arthur Bassin, a member of the Bank's Board of Directors, regarding Truitt's campaign because he was also an elected official. Joint App'x at 411. According to Truitt, Cahill told him that Bassin expressed discomfort to Cahill about Truitt running for the position and working for the Bank. *Id.*

The next day, on April 27, 2018, the Bank's Board of Directors met. According to the meeting notes, Cantele reported that an employee "hired as a Mortgage Originator for the Riverside Division" and "currently serving as a Dutchess County Legislator" had "announced his campaign" for a State Assembly seat. *Id.* at 322. The notes stated that the Bank's management "had determined that this position [the Assembly seat] pays approximately $80,000 per year and requires approximately 65 days per year in Albany." *Id.* Accordingly, management "intend[ed] to speak with the employee and advise him that this would be a conflict of interest and [that] he must make a decision whether to run for office or to continue employment with the Bank." *Id.* A memorandum also dated April 27 from Cahill to the Bank's "HR/Compensation Committee," which includes Bassin and other members of the Board of Directors, identified Truitt as the employee. *Id.* at 323.[3] The memorandum stated that the

---

[3] According to Bassin's deposition testimony, "[t]he Board of Directors and the [HR/Compensation Committee] don't manage the bank," and "in the specific case of these outside employment things, the management team reviews those situations and brings [them] to the Board's attention" to discuss whether there is a problem and what to advise an employee. *Id.* at 136. Then, the Board and the HR/Compensation Committee "say[ ] that sounds fine to us." *Id.* The committee does not "actually do the review of what [the employee's] outside activities are." *Id.* Similarly, Cantele noted that, while the Board of Directors receive outside employment request reports, "they do not evaluate" them. *Id.* at 142.

Bank's management was "reviewing whether a conflict of interest exists with the State Assembly campaign and position." *Id.*

Three days later, on April 30, 2018, Truitt met with Cantele to reiterate his desire to campaign and serve as an assemblymember while he worked for the Bank. Cantele told him that the Bank "did not believe that Truitt would be able to fulfill his position as a residential originator given the responsibilities . . . relative to the Assembly position." *Id.* at 271. Cantele suggested that Truitt and the Bank consider the period from May to November 2018 as a "'time-out' period," and told Truitt that he hoped Truitt would apply for a position with the Bank in the future if he were not elected. *Id.* at 183.

The next day, on May 1, 2018, Truitt emailed Cahill with the subject heading "Decision." Truitt's email stated, in part,

> I did deeply consider and weigh my options over this past weekend, and came to the conclusion that I cannot give up on a once in a lifetime opportunity such as the one that has presented itself before me. The chance to tie Teddy Roosevelt as the youngest State Assemblyman in NY history is one I cannot give up, nor can I let down my community who has asked me to run.
>
> I have learned a tremendous amount during my short two months at Salisbury Bank, and I truly appreciated how quickly everyone welcomed me into the family. I

want to especially thank you Doug, for our initial interview and for your help along the way, and also Rick for his leadership and his willingness to meet with me yesterday.

I have a few items that I need to return, including a laptop, a key-f[o]b and a Poughkeepsie parking garage badge. Let me know how you would like me to return those in to you, and I will bring them as soon as possible.

*Id.* Less than an hour later, Truitt sent another email, with the subject heading "Update," to Raymond and Andrea MacArthur, his supervisors. It began by stating that "it has been confirmed" by Cahill and Cantele that Truitt's "employment with Salisbury Bank w[ould] not be continued if [he] pursue[d] election to the New York State Assembly." *Id.* at 179. Truitt's email identified as the Bank's "main concern" that "if elected, [he] would not have the necessary time it takes" to be successful at the Bank, but it stated that he "disagree[d] with th[at] sentiment entirely." *Id.* Further, the email noted that he had "thought deeply" about the decision but that running for the Assembly was a "once in a lifetime opportunity." *Id.* The email concluded by thanking his supervisors and noting the possibility of returning to the Bank as an employee if his campaign was not successful.

The Bank recorded Truitt's last date of employment as April 30, 2018.[4] Truitt did not win the election.

## B. *Proceedings Below*

On August 24, 2018, Truitt filed this action in state court against the Bank and its parent company, defendant-appellee Salisbury Bancorp, Inc., alleging that he had been discharged by the Bank in violation of New York Labor Law § 201-d. The Bank then removed the action to federal court on diversity jurisdiction grounds.

On January 28, 2020, following discovery, the Bank moved for summary judgment. The district court granted the motion on July 21, 2020. *Truitt v. Salisbury Bank & Tr. Co.* ("*Truitt I*"), No. 18-CV-8386 (NSR), 2020 WL 4208452, at *12 (S.D.N.Y. July 21, 2020). The court concluded that "even when drawing all inferences from the record in [Truitt]'s favor, his departure from the Bank [wa]s best classified as a resignation." *Id.* at *10. Further, the court concluded that the resignation did not amount to a constructive discharge

---

[4]     Truitt disputes that this was his last date of employment, asserting instead that it was May 1, 2018 -- the day that he emailed the Bank's management letting them know that he was going to continue his campaign. But Truitt's May 1, 2018, email to Cahill suggests that Truitt first "informed [Cantele] that [he] w[ould] continue" his campaign on April 30, 2018. *Id.* at 183.

because the Bank did not subject Truitt to intolerable working conditions and "[t]here [wa]s no indication that [Truitt] would be fired no matter what he decided," or that the Bank "forced him to decide between termination or resignation." *Id.* at *11. Judgment was entered on July 21, 2020.

Two weeks later, on August 4, 2020, Truitt timely moved for reconsideration of the district court's July 21, 2020, order. The court denied the motion on March 22, 2021. *Truitt v. Salisbury Bank & Tr. Co.* ("*Truitt II*"), No. 18-CV-8386 (NSR), 2021 WL 1089888, at *5 (S.D.N.Y. Mar. 22, 2021). The district court did not reach the issue of whether Truitt was discharged for his political activity because it concluded that he voluntarily resigned and thus was not subjected to an adverse employment action and, in any event, he was "at the beginning stages of his campaign." *Id.* at *5.

This appeal followed.

### DISCUSSION

**A.    *Standard of Review***

"We review a district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor." *Dish Network Corp. v. Ace Am. Ins.*

- 13 -

*Co.*, 21 F.4th 207, 212 (2d Cir. 2021) (quoting *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011)). "Summary judgment is appropriate where the record reveals that there is 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *McElwee v. County of Orange*, 700 F.3d 635, 640 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(a)). A genuine factual dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**B.    *Applicable Law***

Under New York Labor Law § 201-d, an employer may generally not refuse to hire, discharge, or otherwise discriminate "in compensation, promotion or terms, conditions or privileges of employment" against an employee for, among other things, engaging in "political" or "recreational" activity if such activity is legal and occurs outside of working hours. N.Y. Lab. Law § 201-d(2).[5] The statute expressly provides that an employee may sue an

---

[5]    The statute also prohibits an employer from refusing to hire, discharging, or discriminating against an employee based on an employee's "legal use of consumable products" or "membership in a union." N.Y. Lab. Law § 201-d(2)(b), (d). The statute carves out a number of safe harbors, including where the employee's otherwise permissible outside activities would create certain kinds of conflicts of interest; where

- 14 -

employer who violates the statute for "equitable relief and damages." *Id.* § 201-d(7)(b).[6]

Section 201-d was enacted in 1992 to "prohibit employers from discriminating against employees for engaging in certain off-duty activities," including "political or recreational activity, use of legal consumable products[,] or union activities." Memorandum, Governor's Bill Jacket, L. 1992 S. 6935-C, ch. 776, at 11. The bill, commonly referred to as the "Legal Activities Bill," sought, for instance, to protect those who smoked and used tobacco products outside of working hours "against the extensive vigilantism" of their employers. *McCavitt v. Swiss Reinsurance Am. Corp.*, 89 F. Supp. 2d 495, 498-99 (S.D.N.Y. 2000), *aff'd per curiam* 237 F.3d 166 (2d Cir. 2001); *see also* Memorandum, Governor's Bill Jacket, L. 1992 S. 6935-C, ch. 776, at 37; Alyce H. Rogers, Comment, *Employer Regulation of Romantic Relationships: The Unsettled Law of New York State*, 13 Touro L. Rev. 687, 689-90 (1997) (discussing legislative history of New York Labor Law § 201-d).

---

the employer's actions were required by law; and where the employee's actions were "deemed . . . to be illegal or to constitute habitually poor performance, incompetency, or misconduct." *Id.* § 201-d(4)(iii).

[6]     The New York State attorney general may also seek an "order enjoining or restraining the commission or continuance" of violations of the statute, and "the court may [also] impose" civil penalties for such violations. *Id.* § 201-d(7)(a).

This case involves "political activities," which the statute defines as "(i) running for public office, (ii) campaigning for a candidate for public office, or (iii) participating in fund-raising activities for the benefit of a candidate, political party or political advocacy group." N.Y. Lab. Law § 201-d(1)(a), (2)(a); *see, e.g.*, *McCue v. County of Westchester*, 868 N.Y.S.2d 902, 902 (2d Dep't 2008) (concluding that "plaintiff failed to raise a triable issue of fact as to whether he engaged in the subject political activity outside of working hours"); *Wehlage v. Quinlan*, 864 N.Y.S.2d 630, 631 (4th Dep't 2008) (affirming dismissal of employee's action where it was "undisputed that plaintiff did not engage in any [protected] political activities").

Employment discrimination claims are often assessed under the familiar *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). Under the framework, once a plaintiff has established a prima facie case of discrimination, the burden "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for the employer's action against the employee. *Id.* at 802. If the employer does so, then the burden shifts back to the employee to show that the employer's articulated reason is pretext for discrimination. *See id.* at 804-05. The framework is most

- 16 -

often applied in the claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act, 42 U.S.C. § 12112, and the Age Discrimination and Employment Act, 29 U.S.C. § 621 *et seq.*

Neither this Court nor the New York Court of Appeals has addressed whether the *McDonnell Douglas* framework applies to employment discrimination claims arising under New York Labor Law § 201-d. Before the district court, the parties agreed that it does. *See Truitt I*, 2020 WL 4208452, at *9 n.14. On appeal, neither party expressly cites *McDonnell Douglas*, but both Truitt and the Bank rely on its framework. The Bank, for instance, contends that "[e]ven if Truitt was able to establish a *prima facie* case of discrimination . . . the Bank had a legitimate, non-discriminatory business reason for denying his request to engage in outside employment that was not a pretext for discrimination." Defendants-Appellees' Br. at 19. Echoing the Bank's language, Truitt responds that the Bank's justification for its actions "is unsupported pretext for unlawful discrimination." Reply Br. at 13.[7] Because decisions of New York's

---

[7]     The parties' language tracks the steps of the *McDonnell Douglas* framework. After a plaintiff makes out a prima facie case of discrimination, "[t]he burden must then shift to the employer to articulate some legitimate, nondiscriminatory reason for" the adverse action. *McDonnell Douglas*, 411 U.S. at 802. Then, the plaintiff "must . . . be afforded a fair opportunity to show that [the employer's] stated reason . . . was in fact pretext." *Id.* at 804.

Appellate Divisions and other relevant jurisdictions have applied a similar

burden-shifting framework to claims under Labor Law § 201-d, we assume

*arguendo* that the *McDonnell Douglas* framework applies to this case. *See Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (assuming *arguendo* that

"the *McDonnell Douglas* framework is fully applicable" to ADEA actions

"[b]ecause the parties do not dispute the issue").[8]

## C.  *Application*

On appeal, Truitt makes two principal arguments.  First, he

contends that the Bank unlawfully "forced" him to decide between "termination

or his protected political activity" and that, as a result, his departure from the

Bank was involuntary.  Plaintiff-Appellant's Br. at 20.  Second, he argues that the

---

[8]     *See, e.g.*, *Baker v. City of Elmira*, 707 N.Y.S.2d 513, 514 (3d Dep't 2000) (explaining that "it was incumbent upon [the employer] to come forward with admissible evidence showing that [the employee's] political affiliations and activities did not play a substantial part in its decision" (quoting *McManus v. Grippen*, 663 N.Y.S.2d 722, 723-24 (3d Dep't 1997))); *Miller v. Village of Wappingers Falls*, 734 N.Y.S.2d 190, 190 (2d Dep't 2001) (applying burden-shifting framework to action where plaintiff alleged that "he was improperly terminated from his employment because of his Republican Party membership"); *McManus*, 663 N.Y.S.2d at 723 (applying burden-shifting framework to § 1983 claim for violation of First Amendment rights alleging that the "defendants had violated [plaintiffs'] Federal and State Constitutional rights by removing them from their positions solely because of or in retaliation for their affiliation with the Democratic Party"); *see also, e.g.*, *Torres v. LaLota*, No. 15-CV-7097, 2017 WL 4457514, at *7 (E.D.N.Y. Aug. 14, 2017), *R. & R. adopted*, 2017 WL 4443578 (E.D.N.Y. Sept. 30, 2017); *Fishman v. County of Nassau*, No. 10-CV-3231 (MKB), 2013 WL 1339466, at *9-10 (E.D.N.Y. Apr. 1, 2013).

- 18 -

Bank has only proffered as a reason for its actions his statutorily "protected political activities." *Id.* at 31. The Bank responds that Truitt "*chose* to resign" and "therefore did not suffer an adverse employment action." Defendants-Appellees' Br. at 17 (emphasis in original).[9] The Bank also argues that, even assuming Truitt had suffered such an adverse action, its reason for denying his request was legitimate, non-discriminatory, and not pretextual. *Id*. at 19; *cf. McDonnell Douglas*, 411 U.S. at 803-06.

Two issues are thus presented: whether Truitt presented evidence from which a reasonable jury could find that he suffered an adverse employment action, and, if so, whether the Bank demonstrated, as a matter of law, that it had a legitimate, non-discriminatory reason for its employment decision.

1. *Did Truitt Suffer an Adverse Employment Action?*

Whether Truitt suffered an adverse employment action hinges on whether the Bank could lawfully require him to choose between his political campaign and his job. Section 201-d makes it unlawful for "any employer . . . to

---

[9] Although the Bank's brief argues that Truitt failed to *establish* a claim for employment discrimination, we note that a non-moving party on a motion for summary judgment is required to show only that a genuine issue of fact "worthy of trial" exists. 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2727.2 (4th ed. 2022).

refuse to hire, employ or license, or to discharge from employment or otherwise discriminate against any individual in compensation, promotion or terms, conditions or privileges of employment because of" an employee's political activities. Although the district court recognized that adverse employment actions may take many forms, it granted summary judgment on the basis that Truitt could not demonstrate that he had been constructively discharged. *Truitt I,* 2020 WL 4208452, at *9-10.

The district court concluded that Truitt was not discharged because he voluntarily resigned after his request to engage in outside employment was denied. This was error, for a reasonable jury could find that the Bank discriminated against Truitt when it forced upon him an impermissible choice between keeping his job and engaging in statutorily protected political activity. Courts have held that offering this type of impermissible choice can constitute a discriminatory adverse employment action. *See, e.g., Mathis v. Christian Heating & Air Conditioning, Inc.,* 158 F. Supp. 3d 317, 320, 334-35 (E.D. Pa. 2016) (holding that a reasonable jury could find that plaintiff was constructively discharged when given a "choice between continuing to work under conditions that offended plaintiff's beliefs or ending his employment"); *Ross v. U.S. Capitol Police,*

- 20 -

195 F. Supp. 3d 180, 194, 203-05 (D.D.C. 2016) (concluding that the plaintiff plausibly stated a claim for discrimination based, in part, on the alleged adverse employment action of being "forced to make the . . . choice of either tendering his retirement application or placing his retirement annuity and other benefits in jeopardy by continuing to fight his termination" (cleaned up)); *see also Hill v. St. Louis University*, 923 F. Supp. 1199, 1209 (E.D. Mo. 1996), *aff'd*, 123 F.3d 1114 (8th Cir. 1997). On this basis, a reasonable jury could find that the Bank subjected Truitt to an adverse employment action when it forced an ultimatum upon him "because of" his political activities.[10] A reasonable jury could also find that, in requiring Truitt to abandon his campaign as a condition of retaining his employment, the Bank "discriminate[d]" against him in the conditions of his employment, in violation of the terms of the statute.

Truitt began campaigning for the Assembly seat, and his campaign was not interfering with his work. The managers at the Bank were not aware of any complaints from his colleagues that he was unable to perform his work

---

[10]    Given our holding, we do not now address Truitt's arguments that Salisbury also violated New York Labor Law § 201-d by (1) allowing Bassin, who was also a financial supporter of Truitt's Democratic opponent in his campaign, to be involved in the decision to discharge him and (2) falsifying Truitt's last date of employment to prevent him from receiving employee benefits.

responsibilities because of the campaign. Nevertheless, he was given less than a week to decide between continuing his campaign *or* continuing to work for the Bank.[11] It was apparent that the Bank was not going to permit him do both. Cahill and Cantele made clear that "if [he] was running [he] could no longer continue working for the bank." Joint App'x at 639. As Truitt's May 1 email noted, Cahill and Cantele both "confirmed" that his employment with the Bank would "not be continued" if he pursued the campaign. *Id.* at 179. And that "ultimatum," Truitt explained, made him understand that he "had to pick one or the other." *Id.* at 639. Thus, a reasonable jury could find that he was given an illegal choice between continuing his employment and exercising his right to engage in statutorily protected political activities, and that he was discharged "because of" his choice to continue his campaign.

We are not persuaded by the Bank's argument that it gave Truitt a genuine choice and that he voluntarily resigned. The Bank determined that a job as an assemblymember was incompatible with Truitt's job as a mortgage lending officer and that it would "not provide [Truitt with] an exception to the Bank's

---

[11] The Bank argued that Truitt could not be an assemblymember and an employee at the Bank at the same time; of course, to become an assemblymember Truitt would first have to campaign for the position.

policy on outside employment." *Id.* at 271. The Bank therefore asked Truitt, on or around April 26, 2018, to decide by May 1 whether he "wanted to continue with his . . . campaign for the Assembly." *Id.* at 338. The Bank asserts that it "may have had to make a decision whether to terminate Truitt's employment if his campaigning interfered with his employment . . . or if Truitt was elected to office" but that it made no such decision before "Truitt resigned from his position." *Id.* at 272. Even though the Bank claims that it had not decided to discharge Truitt when it learned of his "Decision," on this record a reasonable jury could find that the Bank had already concluded that Truitt would be discharged if he did not give up his campaign.

For these reasons, a reasonable jury could find that Truitt suffered an adverse employment action by being forced to choose between his campaign and his job in violation of New York Labor Law § 201-d.

2. ***Was There a Legitimate, Non-Discriminatory Basis for the Bank's Adverse Employment Action?***

Next, we turn to whether the Bank's argument that it demonstrated a legitimate, non-discriminatory reason for the adverse employment action. With respect to Truitt's campaigning for office, we conclude that it did not.

The district court chose not to proceed to the second step of a *McDonnell Douglas*-style burden-shifting framework because it held Truitt had "failed to establish that he was terminated." *Truitt I*, 2020 WL 4208452, at *9 n.14. It concluded that summary judgment was warranted because executives of the Bank had "proffered significant testimony and evidence that establishe[d] that the basis for their decision was that management did not feel that [Truitt] could handle the rigors of his job and a campaign for, and potential elected position within, the New York State Assembly." *Id.* at *11 n.16; *see also id.* at *4 n.5.[12] The district court erred, as a matter of law, in granting summary judgment on this basis.

A reasonable jury could find that the Bank failed "to come forward with admissible evidence showing that [Truitt's] political . . . activities did not play a substantial part in its decision" subjecting Truitt to an adverse employment action. *See Baker*, 707 N.Y.S.2d at 514 (quoting *McManus*, 663 N.Y.S.2d at 724). The district court erred because it erroneously conflated

---

[12] In denying Truitt's motion for reconsideration, the district court reiterated that, "[b]ased on an evaluation of the time commitment required to serve in (and by extension, campaign for) the New York Assembly and the high salary, [the Bank] determined that [Truitt] could not feasibly hold both positions." *Truitt II*, 2021 WL 1089888, at *5.

evidence concerning the possibility Truitt might *serve* as an assemblymember with evidence concerning his *campaign* for the Assembly. The district court disregarded this distinction because it did not "see how [it] [wa]s relevant." *Truitt II*, 2021 WL 1089888, at *5. But, as explained above, the distinction is relevant because New York law specifically protects employees running for political office from discrimination. *See* N.Y. Lab. Law § 201-d(1)(a) (defining protected activities to include "(i) *running* for public office" (emphasis added)). Moreover, even assuming the Bank might have had a legally permissible reason to bar Truitt from serving as an assemblymember while employed at the Bank, terminating his employment if he won election would not have required the Bank to bar him from campaigning for office.

To be sure, the record does include evidence that the Bank considered the time commitment required to *serve* as an assemblymember. *See, e.g.*, Joint App'x at 322 (notes from the April 27, 2018, meeting of Salisbury's Board of Directors explaining that Truitt had "announced his campaign to run for NYS Assembly" and that "[m]anagement ha[d] determined that *this position* pays approximately $80,000 per year and requires approximately 65 days per year in Albany" (emphasis added)). Likewise, the Bank argues before us that its

- 25 -

executives were primarily concerned about the time Truitt would have to commit to his duties as a member of the Assembly. *See* Defendants-Appellees' Br. at 19-21. Truitt, contrariwise, argues that he would have been able to serve as an assemblymember outside of his working hours at the Bank. We need not address that factual dispute because, regardless of whether Truitt could have served in the Assembly without interference with his working hours or performance, the record does not include evidence that the Bank had any reason to believe that Truitt's campaign would cause such interference.

The Bank points to Truitt's deposition testimony, claiming that he "acknowledged that, prior to the election, he would engage in a campaign for the seat and that his campaigning would continue even after he would be elected." Joint App'x at 269. But, as the Bank conceded at oral argument, no evidence in the record suggests that Truitt was campaigning during working hours. The Bank also points to the four months Truitt took off to campaign from a job as a finance officer at a construction company, which he secured *after* his employment with the Bank ended. The record, however, does not show that Truitt had requested, or that the Bank determined that he would need, time off to campaign while working at the Bank.

While the Bank's evidence includes some stray references to campaigning, most of these references concern not the campaigning process itself but rather the desired effect of campaigning, *i.e.*, winning the election; other references concern whether Truitt could handle additional, future campaigns if he was elected to office. For instance, Cahill testified during his deposition that his concern with Truitt "run[ning] for the Assembly" was that Truitt would "potentially be away from the bank anywhere from two to four days a week for six months of the year, essentially 60 days that it's in session." Joint App'x at 124. Cantele testified during his deposition that if Truitt were to "take this other job which required him to be out of the bank for at least sixty days a year," then "common sense would say, given this job, that there would be campaigning to be done. *Id.* at 141; *see also id.* at 277-78 (same sentiment in Cantele declaration); *id.* at 279-80 (same sentiment in Cahill declaration).

For these reasons, a reasonable jury could find that the Bank's actions violated New York Labor Law § 201-d because the bank failed to demonstrate a legitimate, non-discriminatory reason for the adverse employment

action it took against Truitt.[13] We conclude that the district court erred in granting summary judgment dismissing Truitt's New York Labor Law § 201-d claim.

## *CONCLUSION*

For the foregoing reasons, we VACATE the district court's judgment granting the Bank's motion for summary judgment and the order denying Truitt's motion for reconsideration, and REMAND for further proceedings consistent with this opinion.

---

[13] As to the safe harbor provisions contained in Labor Law § 201-d, the Bank did not seek the protection of any of these provisions in its answer to Truitt's complaint, *see* Joint App'x at 40-48, and has not relied on or cited them on appeal. Nor has the Bank argued that Truitt's performance had become "habitually poor" or that he had committed "incompetency" or "misconduct." *See* Labor Law § 201-d(4)(iii). As discussed above, the Bank has instead contended throughout this litigation that its actions "were justified by legitimate, non-discriminatory, non-retaliatory" business reasons. *See, e.g.*, Joint App'x at 47; Defendants-Appellees' Br. at 19.